## STATE EX REL. SULLIVAN ET AL. v. SCHNITGER, SECRETARY OF STATE.

STATUTES—APPORTIONMENT ACTS—VALIDITY—ADMISSION OF PARTIES—JUDICIAL NOTICE OF ORGANIZATION OF COUNTIES—LEGISLATIVE DISTRICTS—NEW COUNTIES—JUDICIAL NOTICE OF POPULATION OF STATE—LEGISLATIVE APPORTIONMENT—RATIOS—STATUTES—REPEAL—JUDICIAL NOTICE OF MEMBERSHIP OF LEGISLATURE—HOLDOVER SENATORS—CHARACTER, EFFECT, AND APPLICATION OF APPORTIONMENT CONTAINED IN THE CONSTITUTION—LEGISLATURE ELECTED UNDER INVALID APPORTIONMENT ACT—POWER OF COURT TO DETERMINE QUALIFICATION OF SENATORS AND REPRESENTATIVES—MANDAMUS—TO DETERMINE VALIDITY OF AN APPORTIONMENT ACT.

1. It is not within the power of parties litigant to bind the court by an admission or stipulation that a statute is invalid.

2. The constitution of the State of Wyoming, adopted and ratified at an election held in November, 1889, went into effect upon the approval of the act of admission, July 10, 1890.

3. Judicial notice will be taken of the organization of the counties of the state.

4. The constitution having declared each county a senatorial and representative district entitled to at least one senator

and one representative and apportioned among the then existing organized counties, the senators and representatives to compose the legislature until an apportionment as otherwise provided by law, a newly organized county is constituted a separate senatorial and representative district by a subsequent legislative act declaring it to be such and thereupon entitled to at least the minimum representation uder any general apportionment act.

5. Under an act entitled "An act fixing the state senatorial and representative districts and determining the legislative representation thereof" and declaring that each organized county shall constitute a separate senatorial and representative district, each county so referred to becomes a separate district, and that part of the act may stand as severable from the remainder of the act apportioning the representation, though the latter may be subject to some constitutional objection.

6. Though not mentioned in the temporary apportionment contained in the constitution as separate senatorial and representative districts, the counties organized since the adoption of that instrument have become such by a declaration to that effect in the apportionment acts passed since their organization, and are entitled to have their representation taken into consideration and fixed in any apportionment of senators and representatives, in view especially of the constitutional provision that each county shall constitute a district.

7. The population of the state as determined by authority of law is a matter of legislative as well as judicial knowledge.

8. Where an apportionment act fails to express the ratios upon which senators and representatives were apportioned between the counties as separate districts, the ratios are the number of inhabitants of the state divided by the number of senators and representatives respectively.

9. The provisions of the apportionment act of 1901 fixing ratios for the apportionment of senators and representatives upon the basis of the United States census of 1900 were repealed by the apportionment act of 1907, if the latter act is valid, since the apportionment made by the latter act is based upon a later census enumeration made under state authority in 1905, and is inconsistent with the ratio provisions of the act of 1901.

10. Applying the natural rule as to ratio in the absence of any expressed in the apportionment act of 1907, each organized

county, as a separate senatorial and representative district, was, inclusive of the minimum representation fixed by the constitution, entitled to one senator for each unit of 3771 inhabitants, and one representative for each unit of 1818 inhabitants upon the basis of 27 senators and 56 representatives provided for by the act, and these ratios should have been so applied that each of such districts, though having a population less than such units, should have the minimum representation.

11. The court takes judicial notice of the membership of the legislature and the terms of the senators as the senate is presently constituted, and the journal of either branch of the legislature in so far as it is germane to and bears upon the question involved.

12. The provisions of the constitution relating to legislative apportionment in connection with the provision that senators shall be elected for four years, that those first elected shall be divided into two classes, one to serve for two and the other for four years, contemplate and intend that one-half of the senators shall hold over, and that the hold-over senators shall be taken into consideration in any subsequent apportionment act.

13. The apportionment contained in the constitution was based upon the number of votes cast at the election last preceding the framing of that instrument, and was intended to be temporary in its application, and applicable to then existing conditions. It does not partake of that fixed and enduring character of other constitutional provisions which never yield to legislative enactment, and cannot at any time be applied so as to disturb conditions which are the legitimate outgrowth of other provisions permanent in their nature.

14. A valid legislative enactment superseding the temporary apportionment of senators and representatives found in the constitution is not necessary to render the latter inapplicable, but it may become so through the operation of other constitutional provisions under which the legislative department has been organized and established, and out of which conditons have arisen rendering its present application impossible without violating express and unyielding constitutional provisions.

15. The invalidity, because unfair or inequitable and violative of the constitutional rule of apportionment, of an appor-

(16)

tionment act does not render the legislature elected there-
under illegal, or empower the court to inquire into the
qualification or right of any one to sit as a member. there-
of; the last and final arbiter of such question is the legis-
lature itself, each house being the sole and exclusive judge
of the election and qualification of its members, which
determination *is so far judicial in its nature as to make*
one so admitted a member, not only a member *de facto,* but
*de jure* also.

16. It being contended that the last apportionment act of 1907,
   and the only preceding apportionment acts of 1901 and
   1893 are invalid, because inequitable and violative of the
   constitutional rule of apportionment as between the var-
   ious counties, and that the ensuing election should be or-
   dered to be held under the apportionment found in the con-
   stitution as the. only valid one, it is *held* that, since the
   court is without power to question the right of any mem-
   ber of the legislature as presently constituted to his seat
   therein, or of any holdover senator to his seat in the
   legislature next to convene, a senator who was elected
   for the term of four years by authority of one of the
   alleged invalid acts, in a newly organized county not re-
   ferred to in the apportionment found in the constitu-
   tion, was admitted as a member of the senate, and whose
   term will not expire until after the next ensuing session
   of the legislature, must be treated by the court as a sena-
   tor *de jure* for the full term for which he was elected and
   qualified; and that rule equally applies to the holdover sena-
   tor from the remaining part of the old county out of whose
   territory the new county was created, thus rendering it
   necessary for the court to regard as *de jure* senators two
   from a territory mentioned by the name of the old county
   as a single district and as entitled to but one senator in the
   apportionment section of the constitution.

17. By constitutional provisions, the legislature first consisted of
   16 senators and 33 representatives aportioned between the
   then existing organized counties; each county is declared
   to constitute a senatorial and representative district entitled
   to at least one senator and one representative; senators
   are to be elected for four years, those first elected to be
   divided by lot into two classes, as nearly equal as may
   be, the first to serve for two, and the second for four
   years. New counties were afterwards organized, in one of
   which, as well as in the old county from which it was

taken, pursuant to an apportionment act, a senator had been elected and admitted as a member of the senate, whose term would not expire until after the next ensuing session. Holdover senators were also in office from other old counties which had been divided, in whose election the new counties had no voice; and under the apportionment contained in the constitution such new counties could not be represented except as part of the old counties respectively, since such apportionment was confined to the counties as then organized. It was sought by mandamus to compel an election under the apportionment contained in the constitution, disregarding the apoprtionment acts respectively of 1907, 1901, and 1893, on the ground of the alleged invalidity of each of said acts because violative of the constitutional provision that the apportionment should be made upon the basis of the last enumeration of inhabitants by authority of the state or United States, according to ratios to be fixed by law. Pursuant to the acts of 1893 and 1901 the membership of the legislature had been increased so that at the session of 1907, and when suit was brought, there were 13 holdover senators, thereby allowing the election of only 4 to complete the number apportioned by the constitution, and requiring that number to give the counties named in the constitution their declared representation. *Held,* that an election under the aportionment contained in the constitution would be illegal and ought not therefore to be compelled, since it would violate the constitutional provision for two classes of senators as nearly equal as may be, and the election of 4 senators would give the senate a membership of 17, leaving the house with 33 members, in violation of the constitutional requirement that the number of members of the house shall at no time be less than twice the number in the senate, and such election if held would further result in the representation of certain new counties by holdover senators, not residents thereof and who were not elected therefrom or from an entire district as established by the apportionment of the constitution, but by the electors of that part of the old counties respectively remaining after their division and composing a part only of the original district.

18. The writ of mandamus will only issue in the sound discretion of the court, which means that the question whether it ought to issue depends upon the result of a judicial examination of the facts either as alleged or proven.

19. To authorize mandamus the relators must show a clear legal right to which they are entitled, which is withheld or threatened to be withheld from them, and that it is the legal duty of 'the respondent to perform the act sought to be coerced, and that such performance can only be secured by means of the writ.

20. If mandamus be not the proper remedy, or would be ineffectual to secure the right claimed, then it should not issue, since it would then be of no benefit.

21. The right to the writ does not exist to coerce the performance of an illegal act.

22. It is incumbent upon relators seeking the writ of mandamus to compel the election of members of the legislature in disregard of an apportionment act on the ground that the same is invalid, to show a prior valid apportionment to fall back to, and one under which the election of a valid and constitutional legislature can be held. Failing to do so, and thereby failing to show themselves entitled to the writ, the court is not called upon nor is it necessary to decide the constitutionality of the act assailed, which then becomes a mere abstract question.

[Decided May 12, 1908.]                    (95 Pac., 698.)

ORIGINAL proceeding in mandamus.

The case was instituted upon a petition filed in the name of the State on the relation of Patrick Sullivan and John T. Williams, praying for the writ of mandamus to compel an election of members of the Legislature under the apportionment contained in the constitution, in disregard of all subsequent apportionment acts, each of which acts were alleged to be invalid. Hearing was had upon a demurrer to the petition and alternative writ. The facts are stated in the opinion.

*W. E. Mullen*, Attorney General, for the respondent, in support of the demurrer.

The contention of relators is, that the act of 1907 is void, for the reason that the apportionment is not based upon the census of 1905, and made according to the ratio fixed by the act of 1901, that being the only ratio fixed by any legis-

lature in the state. A failure to follow this ratio and the computations made pursuant thereto in the petition, are made the sole basis of the attack upon the act of 1907. The petition also condemns the entire act of 1901, and yet inconsistently alleges the act of 1907 to be void, in failing to follow a ratio fixed by the prior statute.

The subject of legislative apportionment is referred to under two distinct heads in the constitution. Why was it covered by separate sections under distinct heads, one directing senators and representatives to be apportioned among the counties as near as may be, according to the number of their inhabitants, the other directing senators and representatives to be apportioned on a basis of the last enumeration according to ratios to be fixed by law? The only explanation is found in the debates. Committee No. 2 of the constitutional convention was a "Legislative Committee." Committee No. 6 was a committee on "Boundaries and Apportionment." Each committee made a report on legislative apportionments, and the result was the adoption of two reports under separate heads. Under settled rules of construction, the two sections must be considered together and given effect if possible. The primary principle underlying the interpretation of constitutions and statutes is that the intent is the vital part and the essence of the law. * * * The intent must be found in the instrument itself. (Rasmussen v. Baker, 7 Wyo. 128.) If both sections are to be given effect, legislative apportionments must be based on census enumerations according to ratios fixed by law, and senators and representatives apportioned among the counties, according to the number of their inhabitants. An apportionment law following the first section only, could not be regarded as wholly unconstitutional. For example, a law which apportions senators and representatives among the counties according to the number of their inhabitants, allowing each county at least one senator, and one representative, as directed by the first section, (Art. III, Sec. 3, Leg. Dept.) is constitutional for

it carries out the intent of the constitution, viz., to appor-
tion and distribute representation to the counties according
to their population as near as may be.  The second section,
(Art. III, Sec. 2, Apportionment) would seem to merely
indicate a method of carrying out the provisions of the first.
The petition does not allege a violation of the first section.
It fails, therefore, to state a cause of action, for, if the act
has, in fact, apportioned senators and representatives
among the counties according to the number of their inhab-
itants as near as may be, giving at least one senator, and
one representative to each county, the law is good.  The
petition as we read it does not expressly allege a contrary
condition.  This action is apparently based exclusively upon
the second section; every complaint of inequality is predi-
cated on a ratio requirement which is alleged to be the ratio
fixed by law.  Relying on this section alone, relators can-
not complain on behalf of any county, because the section
deals with "state census enumerations and ratios" and does
not recognize counties, nor the number of inhabitants in any
county.

Measured by the ratio rule recited in the petition, re-
lators allege the act of 1907 to be unconstitutional; the
premises are false and the reasoning unsound.  (a)  The act
of 1901 which fixed that ratio rule, relators themselves al-
lege to be unconstitutional and void.  (b)  The act fixing
that ratio rule has been repealed by the inconsistent act of
1907.  (c)  The act which fixed that ratio was clearly in
violation of Art. III, Sec. 3, (Legislative Department) of
the constitution.

The ratio rule appearing in the act of 1901, gave one
senator and one representative to each county regardless
of its population.  The rule was not only so declared, but
the petition avers that it was followed in the act, except
as to Converse, Albany and Sweetwater counties.  There
is no warrant in the constitution for such a rule.  They are
to be apportioned according to, and not regardless of,
county population.  While a similar rule is fixed in the

act of 1893, long acquiescence in such a rule will not make it constitutional. (Parker v. State, 133 Ind. 178.) The requirement that each county shall have at least one senator and one representative, does not mean that each county shall have one of each regardless of population large or small. That provision was intended for the protection of small counties, where the population is insufficient to give them representation in any other way. It was inserted as a rule of minimum representation, and not as a rule whereunder a senator and representative might be apportioned to each county before commencing to apportion according to population.

The convention understood this provision, and construed it to mean minimum representation and nothing more. This is apparent from the first apportionment appearing in the constitution itself. Where a construction has occurred contemporaneously with the adoption of the constitution by those who had an opportunity to understand the intention, a strong presumption exists that the contsruction rightly interprets the intention. (Cooley Const. Limitations, 82; State v. McAllister, (Tex.) 28 L. R. A. 525.) Similar provisions in the constitutions of other states, have been construed time and again, by their respective legislative bodies, but have never been given the interpretation in their apportionment acts, which we find in the acts of 1901 and 1893, whereby each county is given a complimentary senator and representative, regardless of its population.

Taking up another feature of the ratio of 1901. It is provided "That no county shall have a less representation, either in the senate or in the house representatives than is allowed to such county in the present legislature." This was a provision evidently intended to protect counties, such as the county of Converse for instance, already over-represented at the time, or any county, which according to the last census enumeration might show such a decrease in population as to otherwise require a decrease in its representation. The clear purpose of adjusting apportionments

at the legislative session next following an enumeration of inhabitants is for the purpose of increasing representation where population has increased, and decreasing representation where population has decreased.

We do not regard the allegations relating to the acts of 1901 and 1893 as having any material bearing upon the controversy here. According to our theory, each of said acts has been repealed, but if not repealed, the ratio rule provided in each of them is so clearly in violation of the constitution that we have nothing to offer in their support.

The apportionment found in the constitution was made in view of conditions existing at the time. Defendant offers no objection to it, except that owing to changed conditions, such as the organization of new counties and the increase of state population, it could not be applied without depriving a considerable number of the people of representation. The counties of Big Horn, Natrona, and Weston, have been organized since the adoption of the constitution. An election called pursuant to that apportionment would violate the provisions of Art. 3, Sec. 3, which directs that each county shall have at least one senator and one representative. Great inequalities would exist as between the other counties.

A special session of the legislature would be composed of its present membership which was elected under the apportionment made in 1901. According to relator's theory it is an unconstitutional body. If that be true it has acted heretofore as a *de facto* body. (Throop Pub. Off. 628-637; Mechem Pub. Off. 318; State v. Carroll, 38 Conn. 449; Meagher v. Story Co., 5 Nev. 244; Kirker v. Cincinnati, 48 O. St. 507.) But if the act creating it be adjudged void it is doubtful whether it could act as even a *de facto* body thereafter. There would be no certainty that it would or could enact an apportionment law satisfactory to relators, even if so convened. In seeking for a correct solution of any legal question, especially the construction of a statute, or a constitution, the result which may follow from one construction or another, is always a potent factor and is

sometimes in and of itself conclusive. Courts have a right to consider the evil which would result. (People *ex rel.* Carter v. Rice, 16 L. R. A. 852; Rumsey v. People, 19 N. Y. 52.)

The effect and not the intention of the legislature determines the question of the constitutionality of the act. (Van Bokkelen v. Canady, 73 N. C. 198.) It is our contention that the act of 1907 in fact fixed a ratio for senators and representatives; that it likewise apportioned them among the various counties of the state according to the number of their inhabitants as near as may be, and that the method observed in each instance has the support of well recognized and well settled rules of constitutional and statutory interpretation. The court cannot inquire into the motives of the legislature in making an apportionment. (People v. Thompson, 155 Ill. 451.)

What is a legislative apportionment ratio? The word "ratio" is a mathematical term, meaning a relation between two magnitudes of the same kind; the relation between two similar quantities in regard to how many times one makes so many times the other; relative amount; proportion. (*In re* Clock, 51 N. Y. 597.) The relation which one quantity or magnitude has to another of the same kind.. It is expressed by the quotient of a division of the first by the second. (Webster's Int. Dict. 1191.) Hence, the word "ratio" as used in the constitution means a proportion of the magnitude represented by the entire population of the state, which proportion may be determined by dividing the magnitude by some smaller number, such as the number of senators and representatives provided for in the act, the quotient thus expressing a division or relative part of the first. It is a fixed part of the total population of the state; it is a unit of representation, employed by legislative bodies in apportioning representation among the inhabitants of a state.

Why does the constitution require the use of a ratio fixed by law? The only reasonable object in employing a

ratio unit is to secure a distribution of representation among the people of the state, and over the territorial area of the state, in a manner as nearly equitable as possible. It may be fixed on a percentage basis, or according to arbitrary numbers, or in any other manner that will accomplish an apportionment of representatives among the various counties. This can only be accomplished by the use of some ratio unit of population in making computations.

How may a ratio be "fixed by law" within the meaning of the constitution? A ratio is undoubtedly fixed by law when it is put into effect by an apportionment act, irrespective of whether it be expressed in the act by a form of words. The real question is whether or not an apportionment has been made according to some ratio, and if it has, the discovery of the ratio unit is merely a matter of mathematical computation. The constitutional convention adopted a ratio, viz.: 1,200 of the voting population for senators, and 600 of the voting population for representatives, in making its apportionment. (Constitutional Debates, pp. 82, 573-575.) It did not, however, express its ratio in words and figures, in drafting the section of the constitution containing the first legislative apportionment. It, therefore, interpreted its own rule requiring a ratio to be fixed, to mean, that it should be fixed by actual use, and that it did not require an expression of the ratio rule in any particular form. In Colorado, with a provision identical in language, it has been customary to expressly state the ratios adopted in apportionment acts. In Montana, with the same provision, the apportionment acts have not expressed the ratio, but followed a form similar to our act of 1907. This indicates that it is immaterial whether a ratio be expressed, if one is used. When a ratio is in fact used, and its use governs mathematically the making of the apportionment, as near as may be, and the use of such ratio may be ascertained, by an examination of the act itself, the act has fixed a ratio, and it is a ratio fixed by law within the meaning of the constitutional provision referred to.

Has the act of 1907 fixed and followed a ratio in its plan of apportionment? It is conceded that the act does not contain a formal expression of a ratio, but it provides for 27 senators and 56 representatives or a total legislative membership of 83. The apportionment was based upon the state census enumeration of 1905, which showed the population of the state to be 101,816. By dividing the total population of the state by 27, that being the total number of senators provided for, we have a quotient of 3,771. Using this as a ratio of senatorial representation, and allowing one senator for each time that the population of a county may be divided by it, and one additional senator for each major fraction remaining over, we find the number of senators to which each county is entitled. The only variance found in the application of this rule, is in the case of Laramie county, to which the act apportioned four senators, while under the computations thus made, that county would have a major fraction of 3,450 remaining unrepresented. This variance may be accounted for when it is remembered that three out of the total number of senators go to the counties of Johnson, Natrona and Weston, under the minority rule of representation.

By dividing the population by 56, the number of representatives provided by the act, the quotient is 1,818. Accepting this quotient as the ratio unit for representatives, and dividing the population of each county thereby, and allowing one representative for each time such county population may be so divided, and one additional representative for each major fraction of said quotient, it will be found that representatives were fairly apportioned among the various counties of the state, except in the case of Uinta county, where we find a major fraction of 1,756 for which a representative was not given. That county received a senator on a major fraction of 3,179, which was 592 short of the senatorial ratio of 3,771. This gives Uinta county a complete senatorial representation, but leaves it with a bare major representative fraction

of 1,176 unrepresented, of which there is no complaint. It is true that according to this rule Crook county was allowed a representative on a minor fraction of 195, and it is complained that under a fair approximation, this representative should have gone to Converse county, with a minor representative fraction of 532. It might also be urged that this representative might have gone to Sheridan county with a minor fraction of 875; or to Albany county with a minor fraction of 902, either of which could have presented a claim superior to that of Converse county. The legislature, however, in its discretion, gave the representative to Crook county, perhaps having in mind an equitable distribution of representatives over the territorial area of the state, or considering changes or some increase of population in the northern counties, that had occurred, or might occur, between the census of 1905, and the apportionment that will or should be made, following the census of 1910.

In the case of Weston county, a variance in the rule is found in apportioning one extra representative to that county, and this is complained of in the petition, but the complaint is based on the other plan. But it will be found that even Weston county has 876 more in population than would be sufficient to constitute a major representative fraction, under this plan. This being one of the central tier of counties in the state, the legislature might very properly be presumed to have had in mind the territorial distribution of representatives and to have exercised the discretion which it had authority to exercise, in placing extra or float representatives among minor fractional units of representation, under the plan followed.

The counties of Converse and Natrona have no just ground of complaint, for the reason that, under any conceivable percentage plan, the representation of said counties could not be increased. Their representation could not be increased at all, except under the ratio contended for by relators, which accords to each county an extra senator

and representative regardless of population. They each have minor fractions, considerably less than Sheridan, or Albany, which lacks but eight of a major representative fraction.

What is meant by the term "as near as may be," and has the act of 1907 apportioned senators and representatives among the various counties according to the number of their inhabitants, "as near as may be" within the accepted meaning of the term? It must be assumed that the convention, in making the first apportionment, followed the rules it had laid down in the constitution. Hence such apportionment interprets for us the words "as near as may be," as a contemporaneous construction by the body which used them. (Martin v. Hunter, 1 Wheat. 351; Bank v. Holstead, 10 Wheat. 63; Ogden v. Saunders, 25 U. S. 12 Wheat. 290; People v. Dean, 14 Mich. 406; People v. Treasurer, 23 Mich. 499; R. Co. v. Mills, 85 Mich. 646; Rasmussen v. Baker, 7 Wyo. 117; State v. Swan, id. 166.) After apportioning according to the ratios employed it was found that three representatives remained to be apportioned upon fractional units; and it appears that in disposing of such representatives a mathematically correct apportionment was not made, but it is evident that the apportionment was deemed to have been made according to population "as nearly as may be." The same plan was adopted apparently as that by the legislature in passing the act of 1907.

The words "as near as may be" where used in constitutions directing the manner in which legislative apportionments shall be made, have been quite generally construed to mean words conferring discretion upon the legislature; they are not regarded as words of limitation on the power of the legislature. (R. R. Co. v. Horst, 93 U. S. 300; M. Co. v. Park, 14 Blatchf. 414; Beardsley v. Little, id. 105; Reedy v. Smith, 42 Cal. 251; Prouty v. Stover, 11 Kan. 261; Op. of Justices, 18 Me. 458.) A new apportionment cannot be compelled by mandamus or otherwise unless the

apportionment as made so far disregards the principles prescribed by the constitution as to warrant the court in saying that it is no apportionment and should be treated as a nullity. (State v. Campbell, 48 O. St. 435.) An apportionment act is not to be declared void merely because an apportionment conforming more nearly to the constitutional requirements could have been made. (People v. Thompson, 155 Ill. 450; People v. Rice, 135 N. Y. 473; People v. Campbell, 48 O. St. 435.) Any doubt will be resolved in favor of the statute. (Inv. Co. v. Carpenter, 9 Wyo. 110; State v. Cahill, 12 Wyo. 225; Barkwell v. Chatterton, 4 Wyo. 312.)

*W. R. Stoll,* for the relators, *contra.*

It is not the purpose of the petition to challenge the validity of the ratios fixed by the act of 1901, but only the apportionment made by the act, which failed to follow the ratios provided. Nor is the petition to be properly construed as alleging a violation only of the one section of the constitution relating to census enumerations and ratios, but the theory thereof, determined by its allegations, is that both sections covering the matter of apportionment were violated by the acts in question. The argument that an apportionment which first assigns the minimum representation to each county before proceeding to apportion upon the basis of the number of inhabitants is erroneous serves only to strengthen the position of relators that each act is invalid. Whether the legislature of 1893 and that of 1901 correctly interpreted the constitution or not as respects the provision for minimum representation, that provision should be viewed in the light of the importance of counties in apportionment matters. In our system of government counties have always been considered important parts of a commonwealth. For this reason it is not surprising to find especial reference to counties and to what each county, as a county, is entitled to in the matter of representation. (People v. Thomson, 155 Ill. 451; People v. B'd. 147 N.

Y. 1; Bittle v. Stuart, 34 Ark. 224; Denney v. State, 144 Ind. 503.)

While it would seem reasonable to attribute to the Legislatures of 1893 and 1901 the desire to give prominence to the counties as counties, still if it be held that the section in question in each of these enactments was not justified by the constitutional provision, these sections alone would be invalid, and the other sections which relate specifically to the ratio, would still stand unimpaired so far as this consideration is concerned.

No serious consequences would follow a return to the original apportionment of the constitution. But the argument that such would be the result is never regarded as of sufficient weight to prevent the proper department of the government from being compelled to perform its duty.

If a particular apportionment act is assailed as unconstitutional, and the court find it to be so, and if it be claimed that other preceding apportionment acts are also unconstitutional, it will go back to the next preceding apportionment act, and if this should be unconstitutional, to the next, and so on, to determine which is constitutional, and direct that the notices be given or the necessary steps be taken to make the apportionment in accordance with such act, or with the Constitution itself, unless, in the meantime, the Governor convenes a session of the Legislature to pass a valid apportionment act.    (Giddings v. Blacker, (Mich.) 16 L. R. A. 402; Supervisors v. Blacker, (Mich.) id. 432; People v. Rice, (N. Y.) id. 836; Parker v. State, (Ind.) 18 L. R. A. 567; State v. Wrightson, (N. J.) 22 L. R. A. 548; Denney v. State, 144 Ind. 503; People v. Thompson, 155 Ill. 451; State v. Cunningham, (Wis.) 15 L. R. A. 561; State v. Cunningham, (Wis.) 17 L. R. A. 145.) ·

The wrong in an unconstitutional apportionment is a wrong to all citizens of the State, and any resident of any part of the State may bring the proper action. It is not necessary that the relators in this, or in any similar case, should

reside in the county or district concerning which the wrong complained of exists. (Brooks v. State, (Ind.) 70 N. E. 980.) In further support of the correctness of the foregoing propositions the following cases are cited. *In re* Sherrill, 188 N. Y. 185; Heitman v. Gooding, 12 Ida. 581; Smith v. Baker, (N. J.) 64 Atl. 1,067; People v. Board, 19 N. Y. S. 978; People v. Board, (N. Y.) 33 N. E. 827; Ballentine v. Willey, (Ida.) 31 Pac. 994; People v. B'd., 36 N. Y. S. 40; People v. B'd., 35 N. Y. S. 259; State v. Campbell, (Ohio) 27 N. E. 884; *In re* Baird, 27 N. Y. S. 535; State v. VanDuyn, 24 Neb. 586; *In re* Baird, (N. Y.) 37 N. E. 619.)

The fundamental idea in representative government is equality. This would be easy if the representation were based exclusively upon the entire population of the state, assigning one representative to a certain number in population, and disregarding any other provisions as to districts or counties; but where owing to other and restrictive provisions absolute equality is impossible, it is required that there shall be equality "as nearly as may be." Under the authorities cited the apportionment in each act clearly departed from the requirement that the representation should be as nearly equal as may be as between the counties. It would seem that there was neither an equality nor an approximation to equality when Natrona County with a population of 2,442 was given 1 representative, while Johnson County with a population of 3,027 was given 2 representatives, and Weston County with a population of 3,604, and Crook County with a population of 3,831, were each given 3 representatives; and the same would seem to be likewise true when Converse County, with an unrepresented balance of 1,918, was allowed no representative for this balance, while Carbon County, with a balance of 1,313, was allowed 1 representative for this balance, Crook County, with a balance of 1,581, was allowed 1 representative for this balance, Laramie County, with a balance of 514, was allowed 1 representative for this balance, and

Weston County, with a balance of 1,354, was allowed 1 representative for this balance. It would seem that the principles announced in the cases cited were violated in the instances just named.

The argument that as there appears to be inequality as to only two counties, it is of little moment and should not be held sufficient to disturb the validity of the act, is not sound. In many cases no greater evidences of inequality have been deemed sufficient to invalidate the act assailed.

The whole idea of representative government in this country is that in the House of Representatives we have a body that represents the popular branch of legislature, while in the Senate we have the more aristocratic representation, which are checks upon each other; that it is just as essential, to maintain equality, that each branch should be composed of its proper and proportionate numbers, and that a deficiency in one branch cannot be made up by a surplus in the other. (State v. Cunningham, 15 L. R. A. 561.) Nor can the Legislature take the probabilities of future population or changes therein, into consderation. The act must be based upon the proper census. (State v. Cunningham, 17 L. R. A. 145.) Were the ratio provisions of the act of 1901 repealed by the act of 1907? (1.) The act of 1901 was the only one that did not attempt to fix a limitation as to the time of its duration; hence, on the face of the act itself, it was for all time. (2.) The acts of 1893 and 1901 both did, on their face, establish a ratio and the act of 1907 did not, on its face, attempt to establish a ratio. (3.) If it be held that no legislature had any power to award one senator and one representative to each county, irrespective of its population, then Sec. 2 of the act of 1893, and Sec. 2 of the act of 1901, are to be ignored as unconstitutional, and this fact would not at all affect the ratio established in Secs. 3 and 4 of each of these acts. (4.) Although each of the acts of 1893 and 1901 did, on its face, establish a ratio, nevertheless, Sec. 5 of each of these acts violated its own ratio. This fact, however,

would not affect the fact that a ratio was established. (5.) The act of 1907 does not, on its face, attempt to repeal the act of 1901 or any part of it, except in Sec. 5, which fixes the numbers of senators and representatives, and if it repeals the ratio established in Secs. 2, 3 and 4 of the act of 1901, it does so only because the apportionment made in the act of 1907 did not follow the ratio established in the act of 1901, therefore, the apportionment was inconsistent with this ratio, and, hence, repealed it.

Repeals by implication are not favored and will never be indulged unless it is manifest that the legislature so intended. (26 Ency. L. (2nd Ed.) 721-723.) In cases of implied repeal the repugnancy between the later and the former act must be wholly irreconcilable, and this repugnancy must be clear and convincing, and must necessarily follow from the language used. (26 Ency. L. (2nd Ed.) 725-728.) While it is true that when the later of two acts governs the whole subject matter of the earlier one, even though it does not purport to amend it, so that it plainly appears that it was intended to be a substitute for the earlier act, the later act will operate as a repeal of the earlier one, still there must be an unmistakable intent on the part of the Legislature to make the new act a substitute for the old one and to make it contain all the law on the subject. It is presumed that a statute once enacted is enacted for all time, in the absence of an expression of a contrary intent. (26 Ency. L. 715.) By a provision in a later act that all acts and parts of acts inconsistent with the same are repealed, such act simply repeals previous enactments inconsistent with what is set forth in the repealing act. (Id. 719; Gilbert v. Craddock, (Kan.) 72 Pac. 869; Dolan v. Thomas, 12 Allen, 421; Carter v. Burt, 12 Allen, 424; Simmons v. Bradley, 27 Wis. 689; Gov. v. Stout, 22 Wis. 225; State v. Grady, 34 Conn. 118; People v. Durick, 20 Cal. 94; Booth's Will, 40 Ore. 154; Keyes v. City, 40 App. Div. 409; Robinson v. Rippey, 111 Ind. 112.) We contend that the ratios in each of the acts of

1893 and 1901 were proper, and that every apportionment by the Legislature is void for a failure to follow such ratios. The clause of the act of 1907 repealing all inconsistent parts of prior acts adds nothing to the efficacy of the statute as a repeal of the ratio sections of the previous act.  (Dist. of Columbia v. Sisters &c., 15 App. Cas. 308.)

It is intended that the ratios shall be fixed by law, and not left to conjecture by a mathematical calculation based upon the number of members in proportion to population. But it is only necessary to look at the result according to the tables prepared by the Attorney General to show that even on the basis of the ratios upon which he seeks to sustain the apportionment of the act of 1907, it is unequal and violative of the express constitutional rules for an apportionment.  Upon the basis of his figures, eight counties are involved in the inequalities, a large number compared with the proportionate number involved in the decided cases holding such acts to be void.  There is no basis for the existence of major and minor fractions under our constitution and existing conditions.  It is only a question of equality in representation on the basis of population and the matter of ratios.  There is no room for even a suggestion of any discretion in the Legislature as to fractional parts of a unit or otherwise.

SCOTT, JUSTICE.

The relators have filed a petition in this court in which they pray that a writ of mandamus issue out of this court directed to the defendant commanding him as Secretary of State in notifying the boards of county commissioners of the various counties of the state what public officers are to be elected at the next general election to be held in the present year, to insert in such notice the number of senators and representatives for each county as specified in the legislative apportionment found in the constitution of the state, and to disregard the number of senators and representatives specified in the apportionment acts respectively of

1907, 1901 and 1893, unless in the meantime a session of the legislature shall be called for the purpose of enacting a valid and constitutional apportionment act. An alternative writ of mandamus has been issued and the matter has been heard upon a demurrer to the petition and alternative writ which was filed by the attorney general representing the respondent. The petition for the writ is presented in the name of the state on the relation of Patrick Sullivan and John T. Williams, who are citizens of the United States, the former being a resident, elector and citizen of the County of Natrona and the latter a resident, elector and citizen of the County of Converse; and they allege that they present the petition on behalf of themselves and all the citizens of their respective counties and of the state.

The petition assails the apportionment act approved February 19, 1907, apportioning among the different counties of the state, senators and representatives, as unconstitutional and void for the alleged reasons that the apportionment was not made upon the enumeration of the number of inhabitants of the state made in 1905, and according to ratios fixed by law as required by the constitution, and that the two preceding apportionment acts made in 1901 and 1893 are each unconstitutional for the latter reason, leaving the only valid apportionment of senators and representatives in force in the state that made by the constitution at the time of its adoption, and which was to remain in force and effect until otherwise provided by law. It is charged by the petition that the apportionment made by each act does not conform to a ratio fixed by law, and that the senators and and representatives were not by said acts divided among the counties according to the number of inhabitants, and that the apportionment made by each act is unequal, and gives undue representation to certain counties, leaving others insufficiently represented.

Before proceeding with the other allegations of the petition and the statement of the claims of the respective parties, the constitutional provisions with reference to election

and apportionment of senators and representatives in so far as applicable to the question here involved will be stated. They appear in Art. III, and are respectively as follows:

Sec. 2. "Senators shall be elected for the term of four (4) years and representatives for the term of two (2) years. The senators elected at the first election shall be divided by lot into two classes as nearly equal as may be. The seats of senators of the first class shall be vacated at the expiration of the first two years, and of the second class at the expiration of four years. No person shall be a senator who has not attained the age of twenty-five years, or a representative who has not attained the age of twenty-one years, and who is not a citizen of the United States and of this state and who has not, for at least twelve months next preceding his election resided within the county or district in which he was elected."

Sec. 3. "Each county shall constitute a senatorial and representative district; the senate and house of representatives shall be composed of members elected by the legal voters of the counties respectively, every two (2) years. They shall be apportioned among the said counties as nearly as may be according to the number of their inhabitants. Each county shall have at least one senator and one representative; but at no time shall the number of members of the house of representatives be less than twice nor greater than three times the number of members of the senate. The senate and house of representatives first elected in pursuance of this constitution shall consist of sixteen and thirty-three members respectively."

Under the sub-title of Apportionment are the following sections, viz.:

Sec. 2. "The legislature shall provide by law for an enumeration of the inhabitants of the state in the year 1895, and every tenth year thereafter, and at the session next following such enumeration, and also at the session next following an enumeration made by the authority of

the United States, shall revise and adjust the apportionment for senators and representatives, on a basis of such enumeration according to ratios to be fixed by law."

Sec. 4. "Until an apportionment of senators and representatives as otherwise provided by law, they shall be divided among the several counties of the state in the following manner:

Albany county, two senators and five representatives.

Carbon county, two senators and five representatives.

Converse county, one senator and three representatives.

Crook county, one senator and two representatives.

Fremont county, one senator and two representatives.

Laramie county, three senators and six representatives.

Johnson county, one senator and two representatives.

Sheridan county, one senator and two representatives.

Sweetwater county, two senators and three representatives.

Uinta county, two senators and three representatives.

The relators' complaint is directed mainly to the apportionment of the representatives. No ratio having been expressly fixed in the act of 1907 it is alleged that so much of the act of 1901 as fixed a ratio was continued in force and that the legislature was bound to follow it in the matter of the apportionment in the act of 1907. The act of 1901 provided that each organized county should be represented in the legislature by one senator and one representative regardless of the population of such county and in addition thereto should have one senator for every six thousand inhabitants and one senator for every fraction over 3,500 inhabitants, and also one representative for every 2,250 inhabitants and one representative for every fraction over 2,000 inhabitants, in addition to the minimum allowance of one senator and one representative. Upon the assumption that the ratios so fixed in the act of 1901 should be applied to the apportionment under the act of 1907 it is alleged that Weston county with a population of 3,605 was given three representatives or one to which it was

entitled and two on a major fraction; Crook county was given three representatives or two to which it was entitled and one on a minor fraction; that Uinta county was given four senators when it was only entitled to three, and that Laramie county was given ten representatives when it was only entitled to nine.

But little light is thrown upon the question here presented by the decisions of the courts of other states in cases where the constitutionality of apportionment acts have been questioned. In each case the decision rests upon the construction of constitutional provisions which obtain in the jurisdiction where the question arose and which as a whole differ materially from those in our constitution. It therefore becomes necessary in reaching a conclusion to follow the specific provisions of our constitution giving to them that construction which was plainly intended, and preserving to the relators such rights if any to which they are entitled under the allegations of their petition.

It will be observed that the counties of Big Horn, Natrona and Weston are not named in the apportionment fixed in the constitution, as separate senatorial and representative districts, although for legislative purposes they were by the various acts under which they were created attached to and remained a part of the counties from which they were respectively taken and were so included and formed a part of the districts established in that apportionment. They are however mentioned as separate districts in the different apportionment acts assailed. It therefore becomes a necessary and a material inquiry to determine their status and the effect which an election held under the apportionment fixed in the constitution would have upon these counties and the people residing within their limits.

It is admitted by the respondent in argument that the apportionment acts of 1893 and 1901 are each unconstitutional, but it is urged that the same infirmity does not exist as to the act of 1907. Such admission is one of law and this court is not bound by it. It requires a judicial deter-

mination of a court of competent jurisdiction to effect the validity of a statute on such ground. The question of the constitutionality of a statute is a judicial question and it is not within the power of parties litigant to admit or stipulate as to their invalidity.

In the two former acts a ratio was fixed and expressed in each, but in either act it appears upon the face of the petition that the legislature disregarded such ratio in making the apportionment. It further appears that in both acts the number of senators and representatives to which each organized county was entitled under the constitution was not taken into consideration upon the ratio, but that the latter applied only to those which were allowed in addition thereto. In other words a part only of the apportionment was based upon a ratio. In each act, however, and including the act of 1907, it is provided that each organized county in the state of Wyoming shall constitute a separate senatorial and representative district for the election of senators and representatives. Natrona and Weston counties were so recognized in the act of 1893, and it was further provided in that act that Big Horn when organized should be entitled to one senator and one representative. Without, therefore, discussing further the question as to the unconstitutionality of the apportionment acts of 1893 and 1901 as a whole, we take it that if conceded as being unconstitutional in the matter of apportionment of senators and representatives, they and the act of 1907 as well, constitute a legislative recognition of the organization and a declaration of the right to representation in the legislature of the counties of Natrona and Weston, and of Big Horn when organized, as separate senatorial and representative districts, although they were not established as such in the apportionment made in the constitution. (Sec. 4, Sub-title Apportionment, *supra*.)

Section 1 of the act of 1893 is as follows: "Each organized county shall constitute a separate senatorial and representative district for the election of senators and representa-

tives." Section 1 of the act of 1901 is identical in language, as is also the first part of Section 1 of the act of 1907; and in each act the counties of Natrona and Weston are named, and in the last two the county of Big Horn is also named, as constituting such districts.

The constitution was adopted and ratified by the people at an election held for that purpose on the first Tuesday in November, A. D. 1889. (Section 7, Art. XXI of the constitution, and the act of congress admitting Wyoming as a state of the union.) On July 10, 1890, the act of admission was approved and the constitution went into effect. (Commissioners of the county of Fremont v. Perkins, 5 Wyo., 166, 170.) Between the time of the adoption of the constitution and the admission of the state the county of Weston was created and organized pursuant to Chap. 47, S. L. 1890, approved March 12, 1890, its officers having qualified on May 16, 1890. By Sec. 61, Chap. 90, S. L. 1888, Natrona county was created as an unorganized county with authority to organize upon the petition of 300 electors resident therein, in pursuance of the sections of that act, and did so become fully organized on April 12, 1890, when its officers qualified. The county of Big Horn was created and the manner of its organization prescribed by Chap. 48, S. L. 1890, which was approved March 12, 1890, but its right to so organize was postponed by Sec. 2 of the act until after February 1, 1892,. Neither of these counties was represented in the first legislature which convened on November 12, 1890, as separate senatorial and representative districts, nor as such in the second state legislature which convened on January 10, 1893. At the time the constitution went into effect, viz.; July 10, 1890, Natrona and Weston were organized and Big Horn was unorganized; but for legislative purposes each continued to be part of the county or counties from which they were taken, as provided by the act or acts under which they were created, and as such they were merged in, and though not separately named constituted a part of, the senatorial and representative districts as estab-

lished by the constitution until the third state legislature
which convened on January 8, 1895, when each of them was
represented as separate senatorial and representative dis-
tricts, the county of Big Horn having been organized in
the meantime, and all having been declared to be and con-
stituted under the apportionment act of 1893 such districts
and entitled to representation. Sec. 18, Art. XXI of the
constitution, being the schedule, is as follows: "Senators
and members of the house of representatives shall be chosen
by the qualified electors of the several senatorial and repre-
senative districts as established in this constitution, until
such districts shall be changed by law, and thereafter by
the qualified electors of the several districts as the same
shall be established by law." It is apparent that the mem-
of the legislature were so chosen until after the act of 1893
which had reference to the election of members for the
legislature which convened on January 8, 1895.

Aside from the fact that judicial notice will be taken of
the organization of these political subdivisions of the state
the legislature has recognized them as such and has by the
various acts of apportionment which are here assailed con-
stituted them senatorial and representative districts. The
title of each act is as follows: "An act fixing the state
senatorial and representative districts and determining the
legislative representation thereof." These are cognate sub-
jects and germane to the subject of apportionment, and
being followed in the act by a declaration as to what shall
constitute such senatorial and representative districts clearly
show the legislative intent to establish the districts thus
defined. It cannot be said to be a mere re-declaration of the
constitutional provision and limited to the districts existing
at the time that instrument went into effect, for it was
within the contemplation of the constitution that the legis-
lature should create and establish new districts as
occasion required, and further it was contemplated that
each organized county should constitute such district. Such
counties could be declared as such by a separate act unac-

companied by any general apportionment, and when so
constituted they would each be a territorial unit and entitled
under, any general apportionment act thereafter enacted
to at least the minimum representation fixed under Sec. 3,
Art. III of the constitution as above quoted.    We think
therefore under the well established rule of construction that
so much of the various apportionment acts as fixes and
establishes the senatorial and representative districts is sev-
erable from the balance of the acts and might stand, what-
ever constitutional infirmity may exist as to the remaining
portions of the acts.    (Cooley, Constitutional Limitations,
page 209; Sec. 297, Sutherland Stat. Constr.)    The last
author says at Sec. 130, id.:  "It is germane to the subject
of an act to repeal previous acts relating to it or inconsistent
with it.   Such repeal is ancillary to the purpose of the new
legislation."   See cases cited in the foot notes.   The legis-
lature was expressly authorized by Sec. 7, Art. XXI to
establish new legislative districts, and in pursuance of that
power the legislature did so.   It necessarily follows that
even though the counties of Big Horn, Natrona and Weston
were not separate senatorial and representative districts at
the time the constitution went into effect, and were not rec-
ognized as such in the constitution, yet they are such at the
present time and are and were entitled to have their repre-
sentation fixed and taken into consideration in any appor-
tionment of senators and representatives.   This is conceded
by relators in their petition in so far as Natrona and Weston
are concerned.   It is not alleged that they were entitled to
no representation but on the contrary it is alleged that each
was entitled to two representatives, notwithstanding which
it is sought to have this court issue its writ which would
in effect deprive them of any and all right of representation
to which they are now entitled as separate senatorial and
representative districts.   If entitled to representation as
alleged they constitute legislative territorial units under
the provisions of the constitution.   The conceding of the
right to two representatives from each of those counties

by the allegations of the petition is inconsistent with and negatives the right of relators to have them deprived of separate representation as such districts.

The issue as to the existence of Big Horn county as a separate senatorial and representative district is not tendered nor is its right to represenation in the legislature questioned except in the manner in which it would be affected by compelling an election to be held under the apportionment fixed in the constitution. We think upon the theory of relators' case as disclosed by their petition and the argument and brief thereon that they must be held to concede that these counties are now separate senatorial and representative districts and as such are entitled to representation in the legislature and that such right must be recognized under any apportionment act. The petition attacks the apportionment act as a whole upon grounds which do not involve the question of their existence or right as such districts to separate legislative representation. In all the computations made by relators in their petition and brief in attempting to show the injustice and inequality of the apportionment acts complained of, these counties are recognized and taken into consideration with all the other counties of the state as constituting separate districts for legislative purposes. Aside, however, from the rule that relators should be held bound by their theory and its logical sequence we are nevertheless compelled to the conclusion that these counties were constituted and have continued to be such districts by reason and in pursuance of legislative enactments ever since the apportionment act of 1893 and the organization of Big Horn and the admission of their senators and representatives elected under such act to seats in the third state legislature which convened on January 8, 1895.

By the act of 1907 the number of senators was fixed at twenty-seven and the number of representatives was fixed at fifty-six. It is thus seen that the relative number in membership of the senate and the house of representatives is within the constitutional provision and that the act is not objectionable on that ground.

It is urged that as no ratio was expressed in the act of 1907 that the ratio fixed in the ·act of 1901 was continued in force and should have been applied and followed in the former act.  The act of 1907 after fixing the apportionment provides that all acts or parts of acts inconsistent therewith are repealed.  It is contended that the apportionment must have been based upon such ratio in order to be valid but that as the legislature failed to follow it in the last act that it is for that reason invalid.  It is contended by the respondent that that ratio was not the basis of the apportionment. The population of the state as determined by authority of law is a matter of legislative as well as judicial knowledge. The petition sets out the enumeration of the inhabitants of each county, and the total population of the state as shown by the state census of 1905.  The number of members of the lower house and the number of members of the upper house of the legislature is fixed by the act.  While the ratio is not in express words, and it would probably be better to have so expressed it, we should hesitate to hold such a bill unconstitutional upon that ground alone if it is apparent on its face that the legislature was guided by a ratio, and what such ratio was.  In the absence of any expressed ratios the ratios are of course the number of inhabitants of the state divided by the number of senators, and such number divided by the number of representatives.  It is a matter of easy calculation and when departed from is easily detected.  Applying this rule we find that under the apportionment act of 1907, as each organized county constituted a separate senatorial and representative district, each of such districts was, inclusive of such minimum representation so fixed by the constitution, entitled to one senator for each unit of 3,771 inhabitants, and one representative for each unit of 1,818 inhabitants, and these ratios should have been so applied that each of such districts, even though its population were less than these units, should have such minimum representation.  The apportionment made by the act of 1901 is, as alleged, inconsistent with

these ratios and as the act of 1907 is of a later date and based upon a later census enumeration, it necessarily follows from such inconsistency that such ratios were repealed by the last act.

It is contended by the respondent that the inequalities and defects alleged with reference to the apportionment in the act of 1907 were made within the legislative discretion, while it is argued by the relators that they constitute a clear and palpable violation of the constitution. These questions have been ably discussed by the attorneys who appear in this case.

We are not required to go into the question of how far the constitution has lodged discretion in the legislature when it provides that the apportionment must be made as near as may be upon a basis of the number of inhabitants of the county, nor in fixing a ratio, nor as to how far their discretion extends in fixing the number of the members of the house and senate so long as the proportionate membership fixed by the constitution is carried out, for we are met by an obstacle which confronts us upon the threshold of this case which renders it unnecessary to do so.

Sec. 2, Art. III, *supra,* fixes the term of the senators at 4 years, and that of representatives at 2 years, and provides that the senators elected at the first election shall be divided by lot into two classes as nearly equal as may be, those of the first class to serve two years and those of the second class to serve four years. This court takes judicial notice of the membership of the legislature and the terms of the senators as the senate is now constituted and the journal of either branch of the legislature, in so far as it is germane to and bears upon the question here involved.

At the first state election the senators as provided in section 4, sub-title Apportionment, *supra,* numbered 16 in all and the membership of the house of representatives was fixed at 33, and were to be elected from the districts as therein provided. The term of the senators was fixed by lot as provided in Sec. 2, Art. III, *supra.* Neither Big

Horn, Natrona nor Weston counties were mentioned in
that apportionment, but constituted parts of the counties
therein named for legislative purposes; they have, since
the framing and adoption of the constitution, been organ-
ized and as already stated now constitute separate senator-
ial and representative districts, and as such are now entitled
to representation and have respectively been represented in
both branches of the legislature since 1895. The classifi-
cation of the senators and fixing of the long and short term
by the first state legislature in accordance with the consti-
tutional provision and following the rule therein prescribed
together with the increase of membership of both houses as
provided from time to time, whether such senators were
elected under a constitutional or unconstitutional apportion-
ment has brought about the condition that there are now
13 senators whose term of office does not expire until the
first Monday in January, A. D. 1911. One of these sen-
ators is from Weston county, which is not entitled to any
representation as a separate senatorial and representative
district under the apportionment fixed in the constitution
and under which the relators seek to have this court direct
the election to be held. Under the constitutional apportion-
ment the number of senators, as already stated, was fixed
at 16, and were divided among the several counties of the
state as provided in Sec. 4, Sub-title Apportionment, *supra,*
and to be elected from the several senatorial and represen-
tative districts as there established. (Sec. 18, Art. XXI,
Schedule.) If, by any possibility, this court had the power
to interfere with and exclude the senator from Weston
county from his seat in the senate, then under the conten-
tion of relators there would be 4 senators to elect at the
ensuing election and 33 representatives.

It was clearly the intention as gathered from the consti-
tution that one-half of the senators should hold over, and
that the holdover senators should be taken into con-
sideration in whatever apportionment act that should there-
after be passed by the legislature. (Sec. 2, *supra.*) It is

equally apparent that this provision of the constitution would be distorted and practically disregarded if the relief here sought were granted, for it would result in a senate consisting of 12 holdover senators and 4 to be elected for a full term.   As to when or under what conditions this matter would right itself may perhaps be a question of minor importance, and it may be that it is a condition that was not foreseen by the framers of the constitution, yet it is purely a matter of speculation as to when, if ever, the constitutional proportion would or could be re-established. If the senator from Weston county be included, then the election of four senators under the apportionment found in the constitution would make the number of senators 17, whereas the election of representatives from certain districts named is limited to 33.   We would thus have an unconstitutional legislature, for it is expressly provided that in no case shall the number of representatives be less than twice nor more than three times the number of senators.  (Sec. 3, Art. III, *supra.*)

It will be observed that each senatorial and representative district is a territorial unit.   It can not be a senatorial and at the same time not a representative district.

If the constitution were susceptible to the construction that the county of Big Horn upon its organization, and the counties of Natrona and Weston upon the admission of the state, became legislative districts, and as such, without further legislative enactment entitled to the representation of one senator and one representative and that such senators and representatives should be considered as supplementary to the apportionment as made in that instrument, then, as it necessarily follows that no greater representation could be allowed in the absence of legislative enactment, it would be necessary to add the total of the minimum representation from these counties, or 3 senators and 3 representatives to the numbers respectively allowed in such apportionment, which would make 19 senators and 36 representatives.   Upon the facts alleged, Natrona and

Weston counties were each entitled to one senator and one representative, and adding two senators and two representatives to the numbers respectively as fixed in that apportionment, there would be 18 senators and 35 representatives. It is only necessary to state the propositions and the resulting proportions as to membership of the senate and house to show the incorrectness of such reasoning, for a legislature so constituted would also violate the constitutional requirement that the number of representatives shall not be less than twice nor more than three times the number of senators.

The apportionment found in the constitution was based upon the number of votes cast at the election preceding the framing of that instrument. It was intended by the convention to apply only to the first state election. It was so stated in the debates and proceedings of the convention and it was further expected that the first state legislature would pass an apportionment act based on the provisions and requirements of the constitution. It was intended to be temporary in its application and was applicable to the conditions existing at that time. It does not partake of that fixed and enduring character of other constitutional provisions which never yield to legislative enactment; nor can it at any time, be applied so as to disturb conditions which are the legitimate outgrowth of such other provisions and which are permanent in their nature. Such inapplicability does not arise from the infirmity of the apportionment acts complained of, but from fixed conditions with reference to legislative representation which exist at the present time, and which are the outgrowth of other constitutional provisions. It does not follow that a valid legislative enactment is necessary to render this apportionment inapplicable. It may be so rendered by the operation of other constitutional provisions under which the legislative department of the government has been organized and established and out of which conditions have arisen which render it inapplicable without violating the spirit and express provisions of the

(17)

constitution. This question was not involved in any of the numerous cases cited in relators' brief. To review those cases and quote the constitutional provisions under which they arose and attempt to differentiate between those cases and the one before us would only result in a prolixity of words and obscure the meaning and ground upon which we have reached our conclusions. It may, however, be said that in all of those cases the courts have uniformly declined to interfere and declare an apportionment act unconstitutional when there was no prior or antecedent valid apportionment act to fall back to. This rule is well understood by the attorney for relators, for he has based his case and argument upon the theory as contended by him that there has been no valid apportionment act passed by the legislature since the state was admitted, and that being so, he claims that the apportionment fixed in the constitution is in force and that the ensuing election must be held thereunder.

It may be conceded, for the purposes of this discussion, that the present legislature was elected under an inequitable apportionment act, and it may be further conceded that there has not been a fair apportionment act passed since the constitution went into effect, but that does not render the legislature so elected under such apportionment act illegal nor authorize or empower this court to inquire into the qualification or right of any one to his seat therein. Such right cannot be questioned in the courts. (People *ex rel.* Sherwood v. State board of Canvassers, 129 N. Y., 360; 29 N. E. 345; 14 L. R. A. 646; 10 Cent. Dig., 127, Tit. Const. Law.) The last and final arbiter of such question is the legislature itself and each house is the sole and exclusive judge of the election and qualification of its own members. Such determination is so far judicial in its nature as to make one so admitted a member not only *de facto,* but *de jure* also. In speaking upon a similar question where an apportionment act was assailed as being unconstituional, the Court of Appeals of New York say: "As already said, the senate

and assembly elected under the apportionment act and actually assembled, constitute in any respect a *de facto* legislature. As a *de facto* body each house has, under the constitution, not only the exclusive power, but the exclusive right, to judge the title of any of its members to a seat therein. Whoever either house receives as its legally elected member and entitled to a seat becomes thereby a *de jure* member of that house, even though the courts, were such a question triable before them, might be of a different opinion. It follows, therefore, that not only is the present legislature a valid legislature, but that each member thereof, so long as the particular house to which he belongs does not oust him, is to all the world not only a *de facto,* but a *de jure,* member, and he is entitled to all the privileges of a member * * *." (*In re* Sherrill, 81 N. E., 124, 133, 134.) The same principle was recognized by this court in State *ex rel.* Bennett v. Barber et al, 4 Wyo., 56. That was a proceeding in mandamus to require the state board of canvassers to canvass certain returns of the votes cast for the relators for members of the house of representatives from Carbon county at the election held on Tuesday, November 8, 1892. It was there urged upon demurrer to the petition and alternative writ that the court was without jurisdiction to grant the writ because of the constitutional and statutory provision to the effect that each house shall judge of the election, returns and qualification of its own members. The late Justice Conaway, speaking for the court, at page 71, said: "In such cases, the courts are not the last or the principal bulwark of the rights of the people in choosing their representatives. The final and plenary jurisdiction, upon which the people must rely in the last resort in such cases is that of the house of representatives itself. And courts will not entertain the idea that other tribunals, in which the constitution and the laws have vested some small portion of judicial power, will not exercise such power with as much wisdom and justice as could the courts."

We think from the foregoing statement of the law that there is an entire absence of power in this court to question the right of any member of the legislature as now constituted to his seat therein or of any holdover senator to his seat in the legislature to be convened on the second Tuesday in January, 1909, nor have we the power by any ruling in this case to oust such senator from his right thereto. The senator from Weston county must, therefore, be treated as such *de jure* for the full term for which he was elected and qualified, and any apportionment made or election held must be with the view that he and the other holdover senators will be members of and entitled to a seat in the senate to be organized on the second Tuesday in January, 1909, and that their right to seats therein is, and will be independent of any intervening election.

What is here said with reference to the senator from Weston county is equally applicable to the senator from Crook county.

It will be observed that the senatorial and representative district of Crook county as established in the constitution included the territory embraced within the boundaries of Weston county as provided in the act creating the latter, and as such district it was entitled to a representation of one senator and two representatives. The senator from Crook county is also a holdover senator, he having qualified as such on January 8, 1907, and his term does not expire until the first Tuesday in January, 1911. To fall back to the constitutional apportionment means also to fall back to the legislative districts as therein established and those counties would be entitled to but one senator, whereas, they now have two holdover senators whose right to hold their seat is a question which has been passed upon by the legislature itself, and as already stated, its judgment and action thereon is conclusive upon this court. It is difficult to understand how in view of the present unyielding conditions the apportionment made in the constitution can be applied and its integrity and that of the

constitutional provision, with reference to the relative membership of the senate and house of representatives, be preserved. With two senators from a district which was only entitled to one under that apportionment, then to keep down the number of senators to sixteen as therein prescribed, some other district as established therein must be deprived of a senator to which it was entitled, a proceeding that would not be any more within the power of this court than to deprive either Crook or Weston of its senator. Giving the other districts under that apportionment the right of representation as there fixed, and to which they would be entitled, then it necessarily follows that one of those districts having a double senatorial representation the number of senators who would be entitled to seats in the next legislature would be 17, or one more than the apportionment provided for and the number of representatives would at the same time be less than twice that number.

The senatorial and representative district of the county of Carbon as established by the constitution in connection with the act creating and prescribing the method of the organization of Natrona county included for the purposes of representation in the legislature the territory embraced within the boundaries of the latter. Under the apportionment, Sec. 4, Sub-title Apportionment, *supra,* this district was given two senators. Carbon county alone, and ever since the creation of Natrona into a separate legislative district, has itself elected its senators and representatives. At the general election held in 1906, it elected two senators for a term of four years each, commencing on the 8th day of January, 1907, and ending on the second Tuesday in January, 1911, and each duly qualified for such term and they will be entitled to their seats in the next legislature which convenes on the second Tuesday in January, 1909. They were not elected by the people of Natrona county, for that county and its people had no voice in their election. To apply the apportionment as fixed in the con-

stitution would not only deny Natrona the right to elect a senator, but compel it to submit to representation in the senate by non-residents of that county and who were elected solely by the inhabitants of another county and in whose election the inhabitants of Natrona county had no voice whatever. Such senators were not elected from the districts as established in the constitution but by the inhabitants of a part only of such district, and yet this court would be without power to dispossess said senators of their office.

. The legislative districts of Fremont, Johnson and Sheridan as established in the constitution were each entitled to one senator and two representatives. As such they each included a part of the territory now embraced within the limits of Big Horn. Since the organization of Big Horn county the territory included therein has been detached from the counties from which it was taken. The senatorial districts of Sheridan and Johnson each have a senator who was elected at the general election in 1906, and who has duly qualified and whose term as such does not expire until the second Tuesday in January, 1911, and each is entitled to his seat in the senate which is to assemble and organize on the second Tuesday in January, 1909. It is apparent that the same condition exists as to the people of this county that exists as to the people of Natrona. They, by an election held under the apportionment and from the districts as made and established in the constitution, would be denied the right to elect a senator as a separate senatorial and representative district and would be compelled to submit to representation by non-residents of the county and in whose election they had no voice and who also were not elected from the districts as established in the constitution, but by the inhabitants of a part only of such districts.

The writ of mandamus is referred to in the text books and the decisions as a writ of right. The nature of the writ should not be confounded with the right to have it

issue.  It will only issue in the sound discretion of the court.  (People v. Olson, 215 Ill., 620, 622; 33 Cent. Dig., 5 Col. 2053.)  Such discretion means only that the question as to whether the writ ought to issue depends upon the result of a judicial examination of the facts either as alleged or in proof.  Such facts or proof must show at least a clear legal right in the relators and that mandamus is the proper remedy.  The relators must show a clear legal right to which they are entitled and which is withheld or threatened to be withheld from them, and that it is the legal obligation or duty of the respondent to perform the act sought to be coerced and that the performance of such act can only be secured through and by means of the writ.

It is said by some of the authorities that if a legal right is withheld from the relators the consequences of securing such right through the issuance of the writ ought not to be considered.  The courts are not in harmony on this question, but seem to have been governed by the facts in each particular case, so that each case stands practically upon its own footing.  The determination of the question in each case necessarily involves the question of the right sought to be secured and the effectiveness of the remedy for that purpose.  There is an underlying principle in all the cases that if mandamus be not the proper remedy or would be ineffectual to secure the right sought then it should not issue for in such case it would be of no benefit.  It is also fundamental that the legal right to the issuance of the writ never exists to coerce the performance of an illegal act, and that question must be determined upon the facts and conditions existing at the time the application for the writ is made and in determining that question the courts may and should take judicial notice of those conditions which are germane and exist as to a co-ordinate branch of the government and which are the legitimate outgrowth of constitutional provisions.  In Spelling, Injunctions and Extraordinary Remedies, (2nd Ed.) at

Sec. 1,378, it is said: "It would be idle to discuss the question whether any court has power by any manner of process to compel the performance of an act violative of existing statutes." In People v. State Board of Canvassers, 129 N. Y. 360, 29 N. E. 345, 14 L. R. A. 645, it is held that the writ will never issue to accomplish the violation of a constitutional provision. In 26 Cyc., at page 150, it is said: "When it appears that the act sought to be coerced would be unauthorized by law, * * * the writ will be denied." The text is supported by an abundance of authorities cited in the foot notes. Nor will mandamus issue to command an officer to do that which he could not lawfully do without such mandate. (26 Cyc., 166; Rosenthal v. State Board of Canvassers, 50 Kan., 129, 32 Pac., 129, 19 L. R. A., 157; Clark v. Buchanan et al, 2 Minn., 346 (Gil. 298.) In State ex rel. v. County Commissioners, 75 N. W., 579, the Supreme Court of Nebraska say that "the remedy by mandamus must rest upon the legal rights of the relator, upon one hand, and upon the legal obligations and duties of the respondent, upon the other hand. It cannot be predicated solely upon the equities existing between the parties." To the same effect is Davis v. Miller Signal Co., 105 Ill. App. 657, 661.

The counties of Big Horn, Natrona and Weston, not being organized at the time the constitution was framed and adopted, constituted a part of and were embraced in the districts established by the apportionment fixed in the constitution. They have since been organized, the former after the state was admitted and the two latter prior thereto, and as already stated, have been by legislative enactment constituted and are now separate senatorial and representative districts, and as such each is entitled to representation in both branches of the legislature. They have become such districts in pursuance of law, and having been so created they cannot as such be here questioned. The section of the constitution fixing the apportionment says that until otherwise provided by law the senators and represen-

tatives shall be divided among the several counties of the
state as therein provided. These counties were not estab-
lished as separate senatorial and representative districts in
that section, but their rights have matured under other con-
stitutional provisions. To issue a call for an election under
that section of the contsitution would necessarily exclude
them from the call as separate districts and deprive them of
their present constitutional right to elect their senators and
representatives. The provisions of the constitution with
reference to the apportionment then made are mandatory;
they are exclusive as well as inclusive. They include coun-
ties therein named, and established as separate senatorial
and representative districts, and by all rules of construction
exclude districts not so established. Although the counties
of Big Horn, Natrona and Weston formed a part of such
districts they now constitute separate districts in them-
selves. The writ here sought could only apply to the dis-
tricts there named and as then constituted, and must as
measured by the relief sought be limited to those districts.
It is not pointed out how or by what authority the respond-
ent under that apportionment could notify the commission-
ers of Big Horn, Natrona or. Weston counties of the num-
ber of senators and representatives either was entitled to
elect as a separate legislative district.

Under and by all rules of construction they must be
held to be excluded from and disregarded in the apportion-
ment fixed in the constitution, as separate senatorial and
representative districts, and if the writ issue as here prayed
the respondent must notify the commissioners of every
organized county in the state embraced in the districts then
established, and no other, of the number of senators and
representatives to be elected or voted for in the respective
counties so notified. He would be required and limited
by the writ to notify those counties alone and thus ignore
and withhold any notice to the counties of Big Horn, Nat-
rona and Weston as separate senatorial and representative
districts. Further, as already stated, an election in pur-

suance of that apportionment could not affect the title of either the senator from Weston county or the senator from Crook county to his seat in the legislature, and we would then have seventeen senators and thirty-three representatives, which would be an unconstitutional legislature.

This court has no power to apportion the number of senators and representatives. It could not force upon the people of the state an illegal apportionment act. It can only pass upon the questions presented. It has no power to compel the respondent to do an act which is unlawful and it is clear that he has no autohrity to issue notices of an election which if held as prayed by the relators would confer no right upon the persons elected in pursuance thereof to organize as a valid and constitutional legislature. Nor is this court authorized to compel him by its writ to do so. It would be lending the power of the court to the violation of constitutional and vested rights, to partially disfranchise three of the counties of the state, to in effect declare by its allowance a vacancy in the office of either the senator from Weston county or the senator from Crook county, or to require the respondent to issue notices of an election for senators and representatives so that the latter are less in number than twice the number of those who are entitled to a seat in the senate, and which would be a legislature which is unauthorized by the constitution.

In order to entitle the relators to the writ it is incumbent upon them to show a prior valid apportionment to fall back to. This proposition is substantiated by the following cases cited in their brief: Giddings, Relator v. Blacker, Secy. of State, 93 Mich., 1, 16 L. R. A., 402; Board of Supervisors v. Blacker, 92 Mich., 638, 16 L. R. A., 432; People ex rel. Carter v. Rice, People ex rel. Pond v. Supervisors, Horn v. Board of Supervisors, 135 N. Y., 473; 16 L. R. A., 836; Parker v. State ex rel. Powell, 132 Ind., 419, 32 N. E. 836; 18 L. R. A., 567; State v. Wrightson, County Clerk, 56 N. J. 126, 22 L. R. A., 548; Denny, Clerk, v. State ex rel. Basler, 144 Ind., 503, 31 L. R. A., 726; People ex rel.

Woodyat v. Thompson, County Clerk, 155 Ill., 451; State ex rel. Attorney General v. Cunningham, Secy. of State, 15 L. R. A., 568; State ex rel. Lamb v. Cunningham, Secy. of State, 83 Wisconsin, 90; 17 L. R. A., 145. This rule we think is equally applicable to an apportionment made by the constitution which was intended to be temporary in its nature and which has not been directly superseded or displaced by legislative enactments alone but which has been rendered inapplicable to conditions which now exist and which are the outgrowth of the establishment and organization of the legislative department of the government along lines and rules prescribed by other constitutional provisions. Upon the facts alleged the apportionment acts of 1901 and 1893 possess the same infirmity as the act of 1907 and as we have seen the apportionment fixed in the constitution has been rendered inapplicable to the legislative department as now constituted under other provisions of that instrument.

Upon principle and authority as to that branch of the case it is clear that the relators are not, upon the allegations of their petition, entitled to the writ, and that being so this court is not called upon nor is it necessary to decide the constitutionality of the apportionment act of 1907. The relators have no standing to ask this court to decide that question as a mere abstract question of law. (North v. Trustees &c., 137 Ill., 296; People v. Olson, 215 Ill., 620; Kennealy v. City of Chicago, 220 Ill., 485, 505.) They must show that a legal right to which they are entitled is withheld from them, that is to say, they must show a prior apportionment under which the election of a valid and constitutional legislature can be held, that they are entitled to but are denied the right to elect their proportionate membership of a legislature under such prior apportionment; that it is within the power and that it is the legal duty of the party against whom the remedy is sought to perform the act which will secure them that right and that they are entitled to the writ to compel the performance of such act.

As already stated they are not in a position to invoke the extraordinary powers of this court when the effect of the issuance of the writ would be violative of either the statutory or fundamental law of the state, no matter how much they may deem themselves injured or how inequitable or unjust the apportionment act of which they complain may be. The wrongs alleged cannot be corrected by mandamus upon their case as made in the petition, without disregarding express contsitutional provisions and rights which have matured thereunder, the disregarding of which by this court would in any event be as violative of constitutional provisions as the legislative enactments of which they complain.

The demurrer will be sustained, and should there be no further pleadings filed, the writ will be denied.

BEARD, J., concurs.

POTTER, C. J., concurs in a separate opinion.


POTTER, CHIEF JUSTICE.   (Concurring.)

I concur in the conclusion and the grounds thereof stated in the opinion delivered by Justice Scott as the opinion of the court, and I would ordinarily be content with the simple announcement of my concurrence.  But owing to the unusual importance of the case itself, the questions involved, and the grave duty cast upon the court in their determination, as well as the peculiar situation disclosed by existing conditions, if the claims of the relators be correct as to the validity of the legislative enactments called in question, I desire in a separate opinion to set forth the reasons which in my opinion irresistibly lead to the conclusion and disposition of the case announced in the principal opinion. This I do, not alone of my own inclination, but following also the desire of my associates.  I do not expect or hope to add materially to the main opinion, and much that I shall say will be but a repetition of that already said, though perhaps differently expressed.

The relators have brought this case seeking a certain remedy for the enforcement of alleged rights of themselves and others in a like situation as citizens and electors of the state, which rights are alleged to have been interfered with through the enactment of an invalid law by the legislative department of the state government. The only power and jurisdiction that this court would have to pass upon the questions involved in the inquiry whether there has been an infringement of the rights of relators or other citizens and electors by the acts aforesaid must depend upon the power of the court to afford the remedy sought, or at least some fairly adequate remedy, if the allegations of the petition as to the violation of such rights be true in fact and law. The court does not sit nor is it empowered to determine purely abstract questions of law in any case unconnected with the enforcement of legal or equitable rights, and if there is any distinction depending upon the character of the case, the court should be peculiarly careful to ascertain that the question is actually presented and that a decision thereon is necessary before considering the constitutionality of a statute, or at least before adjudging its invalidity; and especially is that true when the statute assailed affects the composition of the legislature itself.

I do not doubt as a general rule the power and duty of the court in a proper case to pass upon the constitutionality of a legislative act, and to adjudge it to be invalid if found to conflict with constitutional provisions, nor, when that question is necessarily involved in the disposition of a pending case properly instituted, to determine whether an act apportioning legislative representation is violative of constitutional requirements, and to declare the same void if found to conflict with such requirements. But the decision should be necessary to a just determination of the case. Judge Cooley, in his work on Constitutional Limitations stated the principle as follows:

"Neither will a court, as a general rule, pass upon a constitutional question, and decide a statute to be invalid, unless

a decision upon that point becomes necessary to the determination of the cause. * * * In any case, therefore, where a constitutional question is raised, though it may be legitimately presented by the record, yet if the record also presents some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, that course will be adopted, and the question of constitutional power will be left for consideration until a case arises which cannot be disposed of without considering it, and when consequently a decision upon such question will be unavoidable." (Cooley's Const. Lim., 3rd Ed., 163.)

Another rule of controlling importance in considering the validity of a statute is that all reasonable doubts must be solved in favor of the legislative act. Such a question is to be approached by the judiciary with great caution, and examined in every possible aspect, and a statute should not be declared void, unless its validity is beyond reasonable doubt. (Id. 182.)

With these principles in mind I propose briefly to examine the allegations and contentions of the parties to ascertain where they lead.

First, it is alleged and contended that the apportionment act of 1901 prescribed a ratio for the apportionment of senators and representatives respectively, and that the act of 1907 is void for the reason that the apportionment therein made was not based upon the ratio so established. In other words the position of the relators is that as ratios were not expressly prescribed in the act of 1907, the ratios of 1901 continue in force and are controlling upon the question of apportionment until new ratios are prescribed. While it is contended generally that the act of 1907 is void on the ground that the senators and representatives are not thereby apportioned among the counties as nearly as may be according to the number of inhabitants, the particular theory of the petition is that the ratios of 1901 controlled and were not followed. It is true that the act of 1907 does

not expressly prescribe or fix ratios, but it does apportion the senators and representatives among the counties, and in a separate section it declares that "all laws or parts of laws inconsistent with the provisions of this act are hereby repealed."

Now, conceding that the apportionment made by the act of 1907 does not follow the ratios of 1901, the act of 1901 in prescribing ratios is then inconsistent with the provisions of the act of 1907. It was clearly within the power of the legislature to repeal the former act, and when it made an apportionment and repealed all inconsistent provisions of other acts, it necessarily repealed the inconsistent ratio provisions of the act of 1901. It it clearly more reasonable and logical to so hold than to say that the later act is invalid because inconsistent with the former one. Of course the repeal would not result if the apportionment in the act of 1907 is void upon other grounds, because if the apportionment part of the act should be declared void, the ratios prescribed by the act of 1901 would not be inconsistent with any of its provisions.

But there is still another and sufficient answer to the claim that the ratios of the act of 1901 controls until other ratios are fixed. The constitutional provision for ratios is found in the section requiring the legislature in 1895, and every tenth year thereafter, to provide by law for an enumeration of the inhabitants of the state, and it is directed therein that at the session next following such enumeration, and also at the session next following an enumeration made by authority of the United States, the legislature shall "revise and adjust the apportionment for senators and representatives, on a basis of such enumeration according to ratios to be fixed by law." The words "such enumeration" in the latter part of the section clearly refers to the last preceding enumeration. It is a publicly known fact and conceded in the petition that the legislature did provide for an enumeration in 1905, and that such enumeration was made. Upon that enumeration, therefore, it be-

came the duty of the legislature in 1907 to revise and adjust the apportionment, as well as according to ratios to be fixed by law. Now the act of 1901 does not prescribe ratios according to the number of inhabitants generally, but the provisions of that act in that particular are that the ratio fixed for senators and representatives respectively shall be based upon the enumeration of inhabitants made in 1900 by authority of the United States. Sections 3 and 4 of the act are similar in this respect, the one providing a ratio for senators and the other for representatives. It will be sufficient, therefore, to quote from Section 3. It reads:

"Each organized county shall have one senator for every six thousand inhabitants and one senator for every fraction over 3,500 inhabitants in such county, as shown by the enumeration of such inhabitants made by the authority of the United States, in the year one thousand and nine hundred."

What can be clearer than that this ratio so fixed and qualified would not control and indeed could not control in an apportionment made subsequent to the state enumeration of 1905, without violating the constitutional requirement that after the later enumeration it should constitute the basis for a revision and adjustment of the apportionment?

Again, the act of 1901 did not fix ratios for all the senators and representatives, but only for those in addition to the one senator and representative respectively allotted to each county. It is true that under the constitution each county is entitled to at least one representative in each legislative body. That, however, does not mean that the ratios shall not be fixed for all, but only that whatever the ratio each county shall have at least one senator and one representative. Nor does it mean that the ratio is necessarily the number of inhabitants in the county having the smallest population, for that would arbitrarily determine the number in each body, and would prevent keeping up the relative size of the two bodies as required by the con-

stitution; and, moreover, the legislature is authorized to determine the number to compose the senate and house respectively, restricted only by the constitutional provisions as to the right of each county to be represented as above stated, that the apportionment shall be based upon the enumeration of the inhabitants as aforesaid according to ratios fixed by law, and that the senators and representatives shall be divided among the counties as nearly as may be according to the number of their inhabitants. As I understand these provisions they require that an apportionment shall be made by dividing the senators and representatives among the counties according to the number of their inhabitants, as nearly as may be, on a basis of the last preceding enumeration made as provided by law, according to ratios to be fixed by law; provided, that each county shall have at least one senator and one representative, even though the number of its inhabitants may be less than the prescribed ratios.

It will be observed that contrary to the rule prescribed in many states, the senatorial and representative districts are fixed by our constitution, each county constituting such a district. It would seem therefore that to prescribe a ratio for the excess only over the minimum allowed to each county might be held to depart from the letter as well as the spirit of the constitution.

There is a further answer that might be made to the claim that the ratios fixed by the act of 1901 are controlling until other ratios shall be expressly prescribed. In the section of that act fixing a ratio for apportioning members of the house of representatives, it is provided that no county shall have a less representation, either in the senate or house, than is allowed to such county in the legislature of 1901 which passed the act. The ratio as to representatives was therefore again qualified, and, if controlling at all, it carries the proviso with it, which might result, as it apparently did in that act, according to the averments of the petition, in awarding to a county a greater number of representatives than it would be otherwise entitled to upon the

ratio without such qualification. And it might result, in case of a decrease in population either through a division of counties or otherwise, in a direct violation of the constitutional provisions relied on here to invalidate the act of 1907. At any rate it seems to make a special ratio as to certain counties, or to exempt them from the ratio altogether.

For either of the reasons above mentioned I think it may well be doubted whether the basis of the particular objections set out in the petition against the act of 1907 has any support upon a proper construction of the constitution and statutes.

However, it is contended that the constitution not only requires that an apportionment shall be actually made according to ratios, but that such ratios shall be fixed by law. With that view I am inclined to agree. The constitution seems to contemplate that the basis of the apportionment shall not be left to conjecture, nor for ascertainment upon independent computation. But it must be remembered that the purpose of the provision, in connection with others upon the same subject, is to secure a fair and equitable apportionment according to the number of inhabitants of the respective counties. Upon a mere technical objection that ratios were not expressed by law, without it appearing that in fact an apportionment was not based upon ratios that were fair and reasonable, and that such apportionment was unfair or inequitable, or not made according to the number of inhabitants as nearly as may be, there would, in my opinion, be strong reason for hesitation on the part of the court to declare an act void.

It is here claimed by the Attorney General, in defense of the act, that ratios were employed, and that they are to be discovered as to both bodies by dividing the number of inhabitants of the state by the number of members provided for each body respectively. Such a division produces a quotient or ratio for the senate of 3771, and 1818 for the house.

Upon the basis of the quotient so found there would appear to be only slight inequalities, and such as might perhaps be expected in any apportionment act, except in the following instances. After allowing Crook county two representatives it would have a fraction over of only 201, but it was given three. After allowing Weston county two representatives, there would be no fraction remaining, but it would lack thirty-two of having the full number for two. It was given three. Uinta was given seven representatives. It had, in addition to enough to entitle it to that number, a major fraction of 1,766 or within fifty-two of the number so found as a ratio for apportioning representatives.

No other county had a major fraction, that is to say more than one-half the number required for a representative, after receiving the number of representatives allotted to it. But though Crook county was given a third representative, having a fraction of only 201 in addition to the number required for two, Natrona county, with a fraction over of 624, was given but one representative, Sheridan, with 875 more than enough to entitle it to five representatives, was given only five, Albany county, with 902 in excess of the number entitling it to five, was given only five, and Converse was given only 2, although it had 532 more than the number required for two.

None of the counties, except Uinta, however, had a large enough fraction over the number required for the representation given it, which would seem to afford reasonable ground of complaint that it had not received its full quota, that is, none except Uinta was left with a major fraction unrepresented, if we may assume that the ratios aforesaid were in fact adopted or employed. But on the other hand, the particular counties above mentioned might perhaps find cause to complain that Weston county was given a third representative in the absence of any number of inhabitants in excess of that required for two, and that Crook was given a third representative upon a smaller fraction than several other counties had, and that therefore those coun-

ties are given greater representation in proportion than
other counties. The complaint therefore would be not that
any county, except Uinta, is discriminated against by not
apportioning to it all that it was entitled to, but that the
discrimination consists in allowing at least one county, and
perhaps two, a larger representation than it or they would
be entitled to under any ratio based upon population.

Adopting the ratio above suggested the Attorney General
contends that the words "as nearly as may be" vest in the
legislature a reasonable discretion not subject to control
by the courts; that in considering the legislative action,
some regard must be given to the difficulties necessarily en-
countered in the passage of an act, and especially one of
this nature where sectional jealousies and differences are
bound to be displayed; and that nothing but gross inequali-
ties, or a plain departure from the constitutional principle,
will justify the court in adjudging an apportionment act
void.

The relators not only assail the act of 1907, but they
allege and contend that the two previous acts—those of
1901 and 1893, are each void, upon the ground that the
ratios established thereby respectively were not followed
in making the apportionment. The Attorney General con-
cedes the invalidity of said former acts, but upon different
grounds. He maintains that each act establishes ratios in
an unconstitutional manner, viz.: By applying them to
some of the members of each body only; and he also con-
tends, as I understand, that the inequalities of the appor-
tionment made by each of said acts are greater than those
appearing in the act of 1907.

By the admission of the relators, therefore, as well as
that of counsel for respondent, if the act of 1907 is invalid,
the acts of 1901 and 1893 are likewise invalid, and if the
act of 1907 is to be held unconstitutional, both of the pre-
ceding acts must also fall. This would leave as the only ap-
portionment the one made in the constitution itself, under
which the elections for senators and representatives were

held prior to the session of 1893, and it is under that apportionment that the relators ask this court to direct the notices for the election this year of senators and representatives to be given. That is the only remedy sought by the relators in this proceeding, and the only one they would be entitled to, if their claims as to the various apportionment acts should be upheld. This case is brought in this court as an original proceeding under its jurisdiction in mandamus as to state officers. The duty sought to be controlled is the requirement of Section 206, Revised Statutes, 1899, that in an election year, within the period therein stated, the Secretary of State shall make out and cause to be delivered to the board of county commissioners of each county a notice in writing, stating what officers, other than county and precinct officers, are to be elected and voted for in the several counties.

I do not doubt that the question as to the constitutionality of the act of 1907, and possibly the two previous acts, is presented in this case, and I suppose the court would have jurisdiction to determine that question in the first instance, before going to any other question in the case. But there is another question that would demand consideration, in the event that the apportionment acts should be decided to be unconstitutional, and upon its determination the right to the remedy sought would ultimately depend. Should we enter upon a full consideration of the constitutionality of the act of 1907, and adjudge it to be invalid, and then upon a consideration of the further questions, viz.: the right to have the notices for the election given under the apportionment in the constitution, should decide, as we would be compelled to do, that the right does not exist, on the ground that such apportionment is totally inapplicable under present conditions, at least so far as the power of the court to enforce it is concerned, the court would find itself in the position of having for no purpose whatever adjudged a legislative act void. While, therefore, the court might take upon itself the responsibility of deciding

upon the validity of the act, without first considering the
other question, I doubt very seriously the propriety of do-
ing so, and hold to the opinion that it is incumbent upon
the court in the first place to ascertain whether the remedy
herein sought is one that can or ought to be granted in any
event. That seems to me as well as the other members of
the court the most logical course, in view of the character
of the questions involved.

I am aware that there are cases holding to the contrary
view. (Parker v. State *ex rel.,* 133 Ind. 178; People v.
Thompson, 155 Ill. 451.) I think that those cases are dis-
tinguishable from the one at bar owing to difference in the
circumstances. In those cases it would have been neces-
sary to examine and pass upon the constitutionality of a
former act as determined by practically the same objec-
tions urged against the later, and I do not understand that
the enforcement of such former act would leave various
sections of the state totally unrepresented in one or other
of the two legislative bodies, or that its enforcement, if
validly enacted, would interfere with constitutional provis-
ions.

In the Indiana case, however, there was a vigorous dis-
senting opinion by Judge Elliott upon the precedence of
the questions in which he gave several excellent reasons
for first considering the right to the remedy in any event.
Among other reasons he mentioned the following:

"Courts will not send against a public officer the extra-
ordinary writ of injunction or of mandamus, unless the
complainant makes it appear that the writ will be effective
in the particular case in which it is demanded" and, "The
inexorable rule is that constitutional questions will never
be decided unless their decision is indispensably necessary
to a final disposition of the case actually before the court."

Upon appeal in a case of a similar nature the New York
Court of Appeals decided the question of the validity of
an apportionment act, and held it to be unconstitutional,
although it made no order in the case for the reason that

the election had occurred under the act, but it was held by the court that the decision would not affect the official rights of the members elected, nor the acts of the legislature, the members whereof had been elected under the void act. (*In re* Sherrill, 81 N. E. 124.)

We conceive that the situation here is greatly different from that apparently presented in other cited cases involving the validity of apportionment acts. But even if our conclusion in this respect would seem not to accord with the decisions by some other courts, we maintain upon principles well settled and universally recognized that under a situation such as is here presented it is eminently more logical and reasonable to inquire in the first place whether the remedy proposed through the intervention of the court is one within its power to grant without compelling a deviation from constitutional mandates.

It is, therefore, in order, before proceeding further with the discussion of the apportionment acts to take up the apportionment embodied in the constitution, together with other provisions therein contained, and review the situation now presented in connection therewith. It may be said here that it is not denied by counsel that as each house is the sole and exclusive judge of the qualifications of its own members, and as the terms of office of the members of the legislature that convened in 1907 have not expired, and will in no case expire until January next, that legislature was a *de facto* legislature, and its members are *de facto* members thereof and that its acts, if otherwise valid, cannot be assailed on the ground of the invalidity of any apportionment act under which the members were elected. It is indeed asserted by counsel for relators, and in that we agree with him, that the same legislature, if called in special session for that purpose, would have the power to pass a valid apportionment act if the one now assailed should be held to be invalid. That is simply a concession to a well settled principle applicable to the acts of public officers generally, as well as the lack of power of the court

by any order in this or any other proceeding to debar a member elected to either branch of the legislature from a seat in the body to which he may have been elected and admitted.

It may be here stated that had there been no subsequent legislation of any character upon the subject, the apportionment section of the Constitution would have remained the only apportionment law for this state. That was declared to be effective until otherwise provided by law. The general statement that it would constitute the apportionment until otherwise provided by law, shows that it was intended to have only a temporary existence or effect. Indeed, in another section it is stated that the senate and house *first elected* under the constitution shall consist of 16 and 33 members respectively, the members that were actually apportioned.

In the absence of any action by the legislature pursuant to constitutional provisions affecting the question of apportionment, the various sections of the state would have remained represented in the legislature as apportioned in the constitution, and very little difficulty or cause of complaint would have arisen, except that new communities might be unfairly represented; but there would not then have existed any legal ground of complaint, nor the condition of affairs that now confronts us.

But the legislature did act and did assume to enact apportionment laws, the first in 1893, under which the members of the legislature of 1895, 1897, 1899, and 1901, respectively were severally elected. In 1901, the second act was passed, under which the members of the legislature respectively of 1903, 1905, and 1907, were elected. Except for the first State legislature, and by the apportionment therein made "until otherwise provided by law," the constitution does not prescribe the number of members for either the senate or house of representatives. The legislature is not restricted in that respect, otherwise than as to the size of the two bodies in relation to each other. In

each apportionment act the number of members in each body was increased, the constitutional proportion between them, however, being maintained.

It is to be rememebred that the constitution was framed by a convention held in September, 1889, while Wyoming was yet a territory, in anticipation of favorable action by Congress upon a bill or proposed bill for its admission as a state. When the bill would be considered or passed could not be known. This is not only evident from the nature of the question, but it was recognized by the convention, and provisions were inserted in the schedule to cover contingencies depending upon the date of statehood. (See Secs. 21, 22, Art. XXI, entitled Schedule.) These provisions had reference to the assembling of the legislature and the general election. The people of the territory voted upon and adopted the constitution at an election held in November, 1889. The act of admission was approved July 10, 1890, and thereupon the Constitution became effective. The first state election was held in September of the same year, and the first legislature of the new state convened in November, and remained in session until the latter part of January, 1891. Between the time of framing and adopting the constitution as aforesaid, and its taking effect, (here using the term "adopted" as referring to the vote of the people thereon) two new counties were organized, Natrona, which had been created from the northern part of Carbon in 1888, and Weston, created from the southern part of Crook, by the legislature of the territory that assembled in January, 1890.

The constitution provided (Art. XII, Sec. 1.) that "the several counties in the territory of Wyoming as they shall exist at the time of the admission of said territory as a state, are hereby declared to be the counties of the State of Wyoming." Under that provision it cannot be doubted that Natrona and Weston counties, having been created and organized prior to the State's admission, became upon such admission counties of the State. Big Horn county had

been created in 1888, but was not organized until after statehood. But it was held by this court that when the state was admitted, said county was a created but unorganized county of the state, and that its organization, though not its creation, was controlled by the restrictive provisions of section 2, Art. XII. (Board, &c. v. Perkins et al., 5 Wyo. 166.)

Neither of these new counties were mentioned in the apportionment of senators and representatives provided in the Constitution; and hence had there been no subsequent enactment of an apportionment law by any legislature of the state, the territory in such counties would no doubt have remained attached to the counties from which they were respectively taken, for the purpose of participation in the election of members of the legislature; for, although each county is expressly constituted a separate senatorial and representative district by the constitution itself, that provision would necessarily be read in connection with the section making a specific apportionment, which, for that purpose, mentioned the counties as they existed when the Constitution was framed. To prevent the non-representation of the territory and people included in the newly organized counties, they would necessarily be regarded as part of the original counties respectively, for the purposes of legislative elections and representation. And that course was in fact followed in the election of the first legislature that convened in November, 1890, and the second that convened in January, 1893.

By the apportionment act of 1893, Natrona and Weston counties were each awarded one senator and one representative, and it was provided that Big Horn County, when organized, should have one senator and one representative. Omitting Big Horn County, the senate and house were by that apportionment to be composed of 18 and 37 members respectively, and with said county the relative membership was to be 19 and 38; thus preserving the constitutional proportion, with or without that county. In

electing senators at the election preceding the session of 1893, it happened that a senator eleced for four years from Carbon County resided in that part of its original territory which had become the County of Natrona. By a provision of the act of 1893 applicable, generally, to every case of that kind, he was to represent, during the remainder of his term, the county wherein he resided, viz.: Natrona.

In the legislature of 1895, and each succeeding legislature, Natrona and Weston counties were each separately represented by a senator, as well as representatives, and commencing with the session of 1897, Big Horn county has been separately represented in each body. Each senator from said counties was elected for the term of four years, the term of office fixed by the constitution. There having been no apportionment act passed between 1893 and 1901, the number of members elected after the organization of Big Horn county, and until and including the session of 1901, continued at 19 and 38 respectively. At the session of 1895, the senate was composed of 18 members, of whom nine, or one-half the number, had been elected at the last preceding election for the term of four years, so that the two classes at that session were equally divided. At the session of 1897, there were ten senators who were to hold office for four years from that time, having been elected at the fall election in 1896, as against 9 whose terms would expire in two years, the latter having been elected at the election held in 1894; and, therefore, at the next succeeding session there were nine newly elected members to serve for four years as against ten in the other class whose terms were to expire before the next following biennial session. This proportion was of course maintained at the session of 1901, the numbers being again reversed, the four-year class containing ten members.

The apportionment act of 1901 provided for a senate of 23, and a house of 50 members, giving each of the new counties separate representation. This increase in the senate resulted in the election of 13 new senators at the election in 1902, so

that the two classes of senators were represented at the sessions of 1903, 1905 and 1907, by 13 and 10 respectively, which was as nearly equal as they could be made, considering the increase in the number of senators, and the term of office of those to be newly elected as provided in the Constitution. The last act, and the one here particularly complained of, that enacted in 1907, provided for 27 senators and 56 representatives. At the session of 1907, 13 new senators were admitted who had been elected in November, 1906, for four years, making it necessary under the act aforesaid, if it shall stand, for the election of 14 senators at the election this year; and thus the relative number in the two clases will be maintained as contemplated by the Constitution.

The present holdover senators, that is, those who will be entitled to seats as senators at the regular session to be held in January, 1909, by virtue of their election in 1906, for four years from January, 1907, were elected in the numbers stated from the following named counties: 2 from each of the counties of Albany, Carbon, Laramie and Uinta, and one (1) from each of the counties of Crook, Johnson, Sheridan, Sweetwater and Weston. In order to give to the respective counties named in the apportionment found in the Constitution the number of senators awarded them thereby, without interfering with the holdover senators above mentioned, it would require an election of a senator in each of the following counties, viz.: Converse, Fremont, Laramie and Sweetwater, or a total of four (4), which, when added to the number of holdovers, makes 17, or one more than the number of senators provided for by the apportionment in the Constitution.

We are, therefore, confronted with this situation, that should the Secretary of State be commanded to call an election under said apportionment it would be necessary for him to determine the counties wherein an election for a senator or senators should be held, unless indeed this court would be authorized to make such a determination and embody the

same in the writ.    But whether that duty would devolve
upon the Secretary or the court, it would be necessary to
either disregard the senators already elected, and call for
an election of an entirely new body of senators, or arbitrarily
disregard the right of one or more of them to the office to
which they have been elected and admitted, or, in order
to keep the number at 16, to arbitrarily ignore one of the
four counties entitled to a senator to make up its repre-
sentation as fixed in said apportionment.

Should the senators already elected and seated not be
disregarded, and we know of no authority on the part of
the court or the Secretary to disregard them, then there
would be 13 senators in one class, and not more than 4 in
the other.    And at any subsequent election new senators
would necessarily be elected for the constitutional term of
four years.    It is, therefore, apparent, using former acts as
an illustration, that should the senate under a new appor-
tionment be composed of 23 as heretofore, or 27 as provided
by the act of 1907, the newly elected senators would num-
ber 19 or 23, while the remaining class would consist of
four only;  and this inequality would continue to exist,
whatever the number of senators, unless reduced to a very
small number, thus defeating the very obvious purpose of
that provision of the Constitution dividing the senators into
two classes.

Again a great reduction in the number of senators would
require a corresponding though less reduction in the num-
ber of representatives, since the latter are in no case per-
mitted to exceed three times the number of senators.    More-
over, if 17 members are to compose the senate, that will
be more than one half the number of representatives, a
condition forbidden by the constitution in the most positive
language;  as neither the court nor the respondent could
add to the number of representatives, it would be imperative
that there be not more than 16 senators, so that it would
be necessary to either deprive some county of its repre-
sentation prescribed in the apportionment of the Constitu-

tion, or some elected senator of his office. If it should be said that the senator elected from Weston county might be disregarded, the fact would be pertinent that he was elected from a part of the territory embraced in the Crook county district under the apportionment sought to be applied, and it is a matter of public state history that the first senator from that district resided in the territory that is now Weston county. While the present senator from that county was elected by the votes of only a portion of the inhabitants of the original district known as Crook county, the same thing is true of the present senator from Crook county; and the territory covered by that district as established by the apportionment in the Constitution has now two elected senators, whereas, it was given but one by that apportionment.

The incompetency of the court to enter an order that would effectively deprive any holdover senator of his office is recognized by all the authorities and the principle is so well settled as to require no citation of cases. But I may refer to a late case in Pennsylvania where a relator in *quo warranto*, claiming to have been elected a senator, questioned the constitutionality of an apportionment act, the court refused to decide the question on the ground that the relator had no such interest as gave him a standing to maintain the writ, and it was said: "Even a judgment of ouster against the respondent would not give the office to the relator, for his own qualifications and the regularity and validity of his election would still be subject to the investigation and judgment of the senate, which is the ultimate and supreme tribunal on these matters." (Commonwealth v. Biddle, 218 Pa. 234, (67 Atl. 355.)

The above statement of the present condition shows not alone the confusion and difficulties that would attend any attempt at this time to go back to the apportionment of the constitution, but to do so would deviate from mandatory constitutional provisions. It is evident that this court cannot in this case or any other either make an apportionment,

or unseat any senator already elected and admitted to that office, nor can we require the respondent, as Secretary of State, to do so, notwithstanding that the holdover senators may have been elected under an unconstitutional act. I wish also to state that the acts of 1893 and 1901, have not heretofore been questioned, at least in any judicial proceeding, until the institution of this case, but they have been acquiesced in by the people as well as the legislature. That fact does not of course, render them valid if in fact or law not so, but it does show that the people have elected their senators from time to time as therein respectively provided, and that the persons so elected have been admitted to the senate as members thereof by the only body authorized by the constitution to ultimately determine their qualifications as senators. But it will be said that the court has no concern with the difficulties or confusion that might flow from the remedy sought in the case, in determining the right to that remedy. Conceding that to be so as a general proposition, the court is concerned in this case with those matters, for they grow out of constitutional provisions equally as important and mandatory, if not more so, than those relied upon by the relators, and by which provisions the court as well as the legislature and the parties are as much bound. In Kentucky it was said by the Court of Appeals in a recent case, with regard to an apportionment act that had been in effect more than thirteen years, "The act of 1893 has gone into effect and the government has been organized under it. To hold it void would be to throw the government into chaos; and this no court is required to do." (Adams v. Bosworth, 102 S. W. 861.)

It would be an anomaly to say that a provision of the Constitution is itself unconstitutional or invalid as conflicting with another provision of the same instrument. We are not here saying that the apportionment made in and by the constitution "until otherwise provided by law" is unconstitutional or invalid for any reason. Such a position is far from our decision. But it is to be read and

construed in connection with other cognate provisions. When that is done if it is found impossible of enforcement, and at the same time maintain inviolate the permanent and mandatory provisions, which admit of no alteration by the court or legislature, then it is our duty to refuse to enforce it.

But in any view of the matter, our position goes a step beyond that. Keeping in mind the evident purpose of the apportionment temporarily made by the constitution, the acts adopted by the legislature, and up to this period acquiesced in by the people, have resulted in a condition impossible of correction by the courts, which must be regarded by the court, so far as this case is concerned, as equivalent to "otherwise provided by law," so as to render the apportionment in the constitution superseded and inoperative.

I do not mean to say that an invald law would of itself destroy the operation or effect of the apportionment section of the constitution; but an act appearing to have been duly enacted and promulgated is to be regarded as valid until otherwise declared by competent authority, and we are now considering the propriety of passing upon the validity of the apportionment acts, if not the power of the court to do so; and what I do maintain upon the facts above stated is that a condition beyond the control of the court has been produced, which, so far as the power of the court is concerned to award the remedy here sought, has caused in effect the apportionment of the constitution to become inoperative.

Where it was sought to have an election for the legislature held under the apportionment act of 1879 in New York, intsead of the act of 1892, assailed as void, and the court could see that if the act of 1892 was invalid, the act of 1879 was also void, and that to hold the later act void would relegate the people to the act of 1866, a law more than a quarter of a century old, the court said that "this would be a travesty on the law and upon all ideas of

equality, propriety and justice." (People *ex rel.* v. Rice, 135 N. Y. 473. In the same case, it appeared that the constitution provided that the establishment of senate districts should be based upon an equal number of inhabitants excluding "persons of color not taxed." The provision for the exclusion of persons of color not taxed in arriving at the number of inhabitants for the purpose stated had been inserted at a time when a man of color not taxed was not entitled to vote by express provision of the constitution. After the war of the rebellion, and the adoption of the 13th, 14th and 15th amendments to the Federal Constitution, the state constitution was amended by omitting the condition for the exercise of the elective franchise by a colored person, and other amendments were also adopted eliminating similar discriminations or provisions based thereon, but the one for excluding colored persons not taxed in computing the number of inhabitants when establishing senate districts was in some way allowed to remain. The question was presented to the court upon an objection to the validity of the apportionment act on the ground that persons of color not taxed had not been excluded in the establishment of senate districts. In the opinion delivered by Mr. Justice Peckham, it was held that the section was not to be construed as excluding such persons, notwithstanding its language, on the ground that the change in policy towards persons of color, clearly indicated by the constitutional amendments referred to, rendered it clear that the basis for the provision had been taken away; and it was held that under the conditions it should be regarded as impliedly repealed by the other amendments.

That case does not, of course, precisely touch the question before us upon the facts, but it does show that subsequent conditions were considered as having an important bearing upon the construction of a particular section of the constituion.

But there is an additional element in the case that I have not referred to, but which is mentioned in the principal

(18)

opinion, viz.: The declaration by the legislature in each apportionment act that each organized county shall constitute a separate senatorial and a separate representative district, following a similar declaration in the constitution. If that portion of each act is valid regardless of the validity of the remainder of the act, and I think there is strong ground for so holding, and, indeed am inclined to the opinion that it must be so held, though perhaps it may not be necessary to do so in this case, then there is the condition that certain established districts are not apportioned any representation by the apportionment in the constitution, and there would be a direct conflict between the apportionment section, which was intended to have only a temporary operation, and other provisions, such as that requiring each county to have at least one senator and one representative. Upon such a conflict the former and temporary provision must yield. Moreover, the legislative act so establishing the districts would then furnish the contingency, "other wise provided by law," upon which the section of the constitution in question was to cease. Although it would amount to a partial provision only, it would render the section of the constitution ineffectual, in consideration of the other related sections. As counsel for relators has contended, and the petition herein asserts, that the ratio provisions of the act of 1901 would not fall, if the section thereof making the apportionment should be adjudged void, I suppose it would be conceded on the part of relators that the section of said act declaring each organized county to constitute a separate senatorial and representative district, would likewise remain unaffected by the invalidity of the provision covering the apportionment of members. At least there would seem that every reason for maintaining that the ratio provisions are separable from the part alleged to be void would equally apply to the provision establishing the districts.

In the opinion handed down for the court, Judge Scott has called attention to the fact that two senators from Car-

bon county, the entire quota awarded that county by the constitutional provision, are holdovers, and were elected from that county as now constituted, so that by leaving them to represent that county would not only deprive Natrona county of any separate senatorial representation, but of any voice in the election of a senator. That would also be the case as to those portions of Big Horn county taken from Sheridan, and Johnson counties respectively. In the case of the Crook and Weston county senators, it occurs to me that it might be a difficult matter upon any legal principle to determine which one, if either, should be deprived of the privilege of serving out the full term. Not only has the senator from Weston county been admitted as such by the senate, but at the last session he was elected vice president of that body, and is probably now holding that office.

The cases cited in brief and argument involving the validity of apportionment acts severally present a far different state of facts as well as different constitutional provisions, from those with which we are concerned. In many if not most of the cases the duty was imposed upon the legislature by the constitution of establishing districts according to the number of inhabitants and under certain other restrictions such as those of compactness and contiguity, but I do not recall a case where, if an election was held under a previous act, certain counties or sections would be deprived not only of representation, but of any voice in the selection of a representative.

Upon any view of the case at bar, should the writ demanded by the relators be granted, not only would there be caused inextricable confusion, but there would occur an inevitable deviation from the permanent provisions of the constitution concerning the formation of the legislature, and representation therein; and in my opinion therefore the only safe and reasonable course is to deny the writ on the ground that the relators have not shown themselves entitled to it, without deciding as to the validity of the apportionment acts.