## STATE, EX REL. CROSS v. BOARD OF LAND COMMISSIONERS

(No. 1953; June 9, 1936; 58 Pac. (2d) 423)

(Rehearing denied November 24, 1936; 62 Pac. (2d) 516)

182

For the relator there was a brief by *Charles E. Winter* and *Wm. B. Cobb* of Casper, and oral argument by *Mr. Winter*.

For the respondent there was a brief by *Ray E. Lee,* Attorney General; *Thomas F. Shea,* Deputy Attorney

General, and *Wm. C. Snow,* Assistant Attorney General of Cheyenne, and oral argument by *Mr. Lee.*

RINER, Justice.

This case is an original proceeding in this court instituted by the filing of a petition on behalf of relator, Cross, to obtain a writ of mandamus directed to the Board of Land Commissioners of the State of Wyoming, the defendant herein, requiring it to deliver to him a patent for certain lands located in Converse County, Wyoming. An alternative writ was issued and the defendant, through the Attorney General of this State, has demurred generally to relator's petition. The sufficiency of that pleading to entitle Cross to the relief he seeks must accordingly be determined.

The material facts contained in the averments thus challenged are these: After setting out that relator was at all the times referred to in the petition duly and legally qualified to receive and succeed to the rights of one J. H. Kennedy, on account of an assignment to relator of an amortization sale certificate of land purchased by Kennedy from the State of Wyoming, through the defendant Board, which Kennedy was properly qualified to acquire, and that the defendant is the duly and legally created Board of Land Commissioners of this State, having the direction, control, leasing, disposing and sale of state lands now or hereafter granted to this commonwealth for the support and benefit of public schools, as prescribed by law, and having also the power to establish rules and regu-

lations not in conflict with law governing the sale of said lands, it is stated that on October 20, 1917, J. H. Kennedy filed his application with the Board aforesaid to purchase from the State certain described lands, in Converse County, comprising about 160 acres, which were indemnity school lands selected by the State and the title thereof obtained by it from the United States.

It is also alleged that this application was on November 18, 1918, approved by the said Board, the land appraised at thirteen dollars thirty-three and one-third cents per acre and ordered sold, with the condition that the mineral rights thereto should be reconveyed to the state before the purchaser received a patent to said lands; that in due course was had notice of sale, report of said sale to Kennedy, bond of purchase and confirmation of sale to him, he having bid $10.00 per acre and not less than three-fourths of the appraised value; that on May 2, 1919, the certificate of purchase for said lands was issued by said Board to him; that on June 17, 1926, said Board cancelled this certificate of purchase and reissued to John A. Kennedy and Wayne T. Kennedy, by transfer from the estate of J. H. Kennedy, deceased, an amortization sale certificate to said land; that on October 27, 1933, an assignment of said certificate from John A. and Wayne T. Kennedy to relator was recorded in the office of the Commissioner of Public Lands; that on May 6, 1935, relator completed all payments due the State on said lands under said certificate and surrendered it; and that on May 22, 1935, a patent for said lands was issued to relator by said Board.

It is then averred that in response to relator's request for the delivery to him of this patent, he was refused such delivery unless and until he executed and delivered to the Board or the Commissioner of Public Lands a deed conveying to the State of Wyoming "all the mining and mineral rights in and to said lands,

including a right to prospect, mine and remove any and all minerals from said lands," and that relator refused and refuses to make such conveyance because he is not required to do so by the laws of this State and the defendant is unauthorized by law to demand the same of him; and that as he has performed all acts legally to be exacted of him, he is entitled to a delivery of the patent aforesaid, as a mere ministerial act on the part of the defendant; that the land in question was not when sold, or has been since, known to contain valuable metals, minerals, petroleum or natural gas in paying quantities, but was agricultural or grazing land and was so classified by the said Board and sold as such; that no one other than relator is interested in the subject-matter of this action, and that he has no adequate remedy at law.

By agreement of the parties an order was entered in this cause that "the court may consider facts shown by certified copies of the records of the office of the Commissioner of Public Lands in connection with the matter." A certified transcript of such records has been supplied and from it the following facts may be noted:

That on May 12, 1917, at a special meeting of the State Board of Land Commissioners, the minutes thereof disclose that: "The Board ordered that all state lands sold after this date be sold subject and reserving to the State of Wyoming all mineral rights together with the right of the State of Wyoming or any person authorized by it to prospect for, mine and remove the minerals"; that in the application filed by J. H. Kennedy on October 20, 1917, with the Commissioner of Public Lands for the purchase of the lands involved here, and signed by said Kennedy, he stated among other things that, "if I am the successful bidder I will convey to the State of Wyoming all the mining and mineral rights in and to said lands, including the

right to prospect for, mine and remove any and all minerals from said land"; that the minutes of a special meeting of said Board held November 18, 1918, recite: "The action of the Commissioner ordering the following lands sold and appraising them at $13.33 1/3 per acre was presented—the mineral rights to be reconveyed to the State before the purchasers receive patents: (describing the lands)", and a confirmation by the Board of the Public Land Commissioner's action in the matter; that the published notice of sale of the lands aforesaid contained among other statements the following: "The said lands will be sold subject to the term and condition that the purchaser, or purchasers, thereof upon receiving title shall reconvey to the State of Wyoming all mining and mineral rights in and to said lands, including the right to prospect for, mine and remove any and all minerals from said lands"; that the report of the sale of said lands, held at Douglas, Wyoming, December 16, 1918, submitted for confirmation by said Board, shows that these lands thus offered for sale were actually sold at that time subject to the "term and condition" last above quoted; that the bond signed by J. H. Kennedy and filed with the Commissioner of Public Lands May 2, 1919, as purchaser of said lands, contained among its recitals the statement that, "a patent will be issued upon the payment of the remainder due on the purchase price and upon the conveyance to the State of Wyoming of all of the mining and mineral rights in and to said lands, including the right to prospect for, mine and remove any and all minerals from said lands; and further that said J. H. Kennedy shall and will faithfully comply with all the terms of the Certificate of Purchase of said lands issued to him by the State Board of School Land Commissioners."

The transcript aforesaid also shows that the Certificate of Purchase issued by the Board aforesaid May

2, 1919, to J. H. Kennedy for said lands states that, "J. H. Kennedy, his heirs or assigns will be entitled to a Patent from the State of Wyoming," upon the performance by him of certain requirements, one of these being "the conveyance to the State of Wyoming of all of the mining and mineral rights in and to said lands · including the right to prospect for, mine and remove any and all minerals from said lands"; and that the Amortization Sale Certificate, which was issued June 17, 1926, to John A. and Wayne T. Kennedy, upon the cancellation of the aforesaid Certificate of Purchase, and assigned to relator, also recites in part that the parties last named, their heirs or assigns would be entitled to a Patent "upon the conveyance to the State of Wyoming of all the minerals and coal in and to said lands, including the right of ingress and egress to prospect for, mine and remove any and all minerals and coal from said lands."

The contentions of the relator, as can readily be gathered from the averments of his petition, are that the State Board of Land Commissioners was without lawful authority at any time to order a reservation of minerals to the State of Wyoming in the state lands which it directed to be sold after May 12, 1917, and that having carried through the transaction in question, with the requirement that the minerals be reconveyed to the State by the purchaser, the provision to that effect is wholly void, is severable from the rest of the contract, and hence there remains but a ministerial duty, resting upon the said Board, to deliver to relator a patent to the land involved, unaffected by this provision.

There are certain principles governing the issuance of a writ of mandamus which may properly here be recalled before proceeding to consider relator's contentions, as applied to the record before us.

It is familiar law that the issuance of such a writ rests upon the sound discretion of the court, i. e., upon the result "of a judicial examination of the facts alleged or in proof." These facts must show a clear legal right in the relator to which he is entitled and which is withheld or threatened to be withheld, and "that it is the legal obligation or duty of the respondent to perform the act sought to be coerced and that the performance of such act can only be secured through and by means of the writ." State ex rel. Sullivan v. Schnitger, 16 Wyo. 479, 95 Pac. 698.

Another pertinent principle supplementing those given above is concisely stated in the case of In re Skinner & Eddy Corporation, 265 U. S. 86, 44 Sup. Ct. Rep. 446, 68 L. Ed. 912, thus:

"Mandamus is an extraordinary remedial process, which is awarded, not as a matter of right, but in the exercise of a sound judicial discretion. Although classed as a legal remedy, in issuing it a court must be largely controlled by equitable principles. Duncan Townsite Co. v. Lane, 245 U. S. 308, 312, 38 Sup. Ct. 99, 62 L. Ed. 309; Arant v. Lane, 249 U. S. 367, 371, 39 Sup. Ct. 293, 63 L. Ed. 650."

In similar vein the Supreme Court of Minnesota in State ex rel. Barnes v. Tauer, 178 Minn. 484, 227 N. W. 499, says:

"Mandamus is an extraordinary legal remedy, but granted upon equitable principles. State ex rel. Hathorn v. U. S. Express Co., 95 Minn. 442, 104 N. W. 556; State ex rel. Phillips v. Neisen, 173 Minn. 350, 217 N. W. 371. Since the proper function of mandamus is to enforce obedience to law, it will be denied, where it appears that the acts sought to be coerced are unauthorized or forbidden by law, or tend to aid an unlawful purpose or transaction. 38 C. J. pp. 556, 557; 18 R. C. L. p. 142; Western Union Tel. Co. v. State of Indiana ex rel. Hammond Elev. Co., 165 Ind. 492, 76 N. E. 100, 3 L. R. A. (N. S.) 153.

"The writ issues to remedy a wrong, not to promote one."

So in 2 Spelling Injunctions & Extraordinary Remedies (2d Ed.) 1178, § 1371, after referring to the rule of discretionary issuance of a writ of mandamus and the duty to allow it when a clear right exists, the author further remarks: "And yet the court may refuse it, even though warranted by the rules of law, if hardship or injustice would result to the opposite or to third parties from granting it." See also 38 C. J. 543, 544; Hutchison v. Reclamation Dist. No. 1619, 81 Calif. App. 427, 254 Pac. 606.

Section 13 of Article VII of the Wyoming Constitution provides:

"The governor, secretary of state, state treasurer and superintendent of public instruction shall constitute a board of land commissioners, which, under direction of the legislature, as limited by this constitution, shall have direction, control, leasing and disposal of the lands of the state granted, or which may be hereafter granted for the support and benefit of public schools, subject to the further limitations that the sale of all lands shall be at public auction; after such delay (not less than the time fixed by congress) in portions at proper intervals of time, and at such minimum prices (not less than the minimum fixed by congress) as to realize the largest possible proceeds."

The Legislature, acting under the authority thus granted it, has provided certain procedural steps to be taken when state lands are sold. See Sections 91-501 to 91-513 W. R. S. 1931, inclusive. The section last mentioned, which was operative as Section 638 Compiled Statutes of Wyoming, 1910, when the lands here involved were sold, reads:

"Whenever the purchaser of any state land, or his assigns, has complied with all the conditions of this article, and has paid all the purchase money therefor, together with the lawful interest thereon, he shall receive a patent for the land purchased. Such patent

shall run in the name of the state of Wyoming; it shall be signed by the governor, and counter-signed by the commissioner of public lands, and attested by the seal of the board. Such patent signed and executed as aforesaid, shall convey a good and sufficient title to the patentee therein named in fee simple."

In support of his contentions, as outlined above, relator relies strongly upon the case of Walpole v. State Board of Land Commissioners, 62 Colo. 554, 163 Pac. 848, where under constitutional and statutory provisions somewhat similar to those quoted above, the court held that the Colorado State Board of Land Commissioners had no power to reserve the mineral rights therein to the State of Colorado when it sold state lands, and that such a reservation inserted in the notice of sale and subsequent certificate of purchase was void. It was accordingly ruled that Walpole might have injunctive relief against the State Board to restrain it from issuing a mineral lease to another on the state land sold to him. This decision was followed in the State of Arizona in the case of Campbell v. Flying V. Cattle Co., 25 Ariz. 577, 220 Pac. 417, where it was held that the State Land Department of Arizona after a sale of state lands in the usual course of procedure and without qualification of any character, could not thereafter insert in the certificate of purchase issued a provision reserving minerals to the state, although that department was authorized by law to make rules and regulations relating to the sale of such lands. This case, however, does not present facts such as appeared in the Walpole case and are now before us for consideration.

In the subsequent litigation growing out of the action of the Colorado State Board of Land Commissioners in inserting mineral reservations in the certificate of purchase of state lands, the case of Gunter v. Walpole, 65 Colo. 234, 176 Pac. 290, is instructive. There

the claim was advanced by Walpole that he could by mandamus exact from the State Board of Land Commissioners "an absolute, unconditional patent, conveying not only the portion of the lands offered and bid for, that is, the lands without the minerals, or in other words, the surface, but also the minerals below the surface." It appeared also that the purchaser had formally tendered the unpaid balance of the amount bid at the time the land was sold and had kept the tender good. Holding that the lower court erred in issuing the writ sought, in the course of the opinion disposing of the case, this was said:

"It is undisputed that what was offered for sale by the State Land Board was the surface only. That is all the purchaser bid for. We cannot say, as a matter of law, that the amount offered by the successful bidder, in the circumstances is the same as would have been paid if the land had been offered for sale in its entirety, undiminished by reservations or exceptions. There being no authority, in the absence of an enabling or validating statute, to sell the subject matter agreed upon by the State Board and the purchaser, it necessarily follows that there has been no valid sale or contract of sale upon which the purchaser can predicate a 'clear legal right' in himself or a 'clear legal duty' on the part of the officers. The transaction lacked compliance with substantial requirements in official procedure. It therefore was wanting in a feature which is as essential for mandamus purposes as for purposes of specific performance, namely, the 'meeting of the minds' always a prime requisite to make an effectual contract.

"The record shows conclusively that the lands for which patent is sought were not sold at public sale, according to the terms of the statute, inasmuch as what was purported to be offered and struck off to the purchaser was only the surface and consequently something incapable of being conveyed under the law as it then stood. There having been a failure to comply with substantial requirements by the State Board of Land Commissioners, the alleged sale is impotent for

the purpose of affirmative judicial relief, and the granting of the writ of mandamus was erroneous."

In the case at bar, even if we should take the ruling of the Walpole case as correctly stating the law in this jurisdiction under the several sections of our statutes relating to sales of state lands and leases of mineral and grazing rights—as relator urges it does—we would logically be obliged, it would seem, to reach exactly the conclusion announced in the Gunter case, i. e., that the writ of mandamus could not properly be issued. Relator argues otherwise as to such a consequence, asserting that in the instant case it may not correctly be said that a "surface right only was offered and bought" and "that the mineral provision was an extraneous one, unauthorized, void matter, which can be ignored as though it had never been written into the contract," and that "the rest of the contract and procedure was complete in itself and in exact accordance with law," and hence must be held operative.

But relator in his brief also calls attention to the language of the order made by the Board under date of May 12, 1917, requiring the sale of state lands to be made with reservation to the State of Wyoming of "all mineral rights," etc., as quoted above. Asserting that "a reservation is not a deed back to the State," and that if it were it would be void within the ruling of the Colorado and Arizona decisions, supra, relator then says: "Practically it effects the same purpose as a reservation, thus bringing it under these cases, yet technically is not a reservation."

We quite agree that for all practical purposes, and in legal effect so far as the case in hand is concerned, there is no difference between the contract of sale requirement of a reconveyance to the state of all mineral rights by the purchaser of the land and the direct insertion in that contract of a reservation of such rights

to the state. In our judgment, however, it is clearly established from an examination of the application to purchase the land in question, signed by J. H. Kennedy, the published notice of sale and the report of the sale itself, as well as the subsequent documentary history thereof, as shown by the significant language from these papers, as set out above, that all that was offered for sale by the Board of Land Commissioners was only the land without the mineral rights, and that this was all that Kennedy bid for when he made his purchase. The sale was an auction sale and open to all, as the law requires. Everyone who saw the notice of sale or who bid for the land was in unmistakable terms advised that he would obtain the land less the mining and mineral rights thereto. Accordingly, if the rules announced by the Walpole and Gunter cases should be here followed, there was undoubtedly no valid sale at all, no meeting of the minds of the parties, and so no "clear legal right" in the relator to entitle him to the writ he seeks.

In Driscoll et al. v. State Board of Land Commissioners of Colorado, 23 Fed. (2d) 63, the facts were briefly that Driscoll held a certificate of purchase of certain indemnity school lands ceded to the State of Colorado by the United States, he having purchased them at public auction as the highest bidder thereat. He had made all payments required by the certificate of purchase, which contained a reservation to the State of Colorado of all rights to any and all minerals and the right of ingress and egress for mining purposes. The State Board of Land Commissioners refused to issue a patent to him unless Driscoll would quitclaim these reserved rights to the State of Colorado. These facts appeared by Driscoll's bill in equity seeking, among other relief, to compel the issuance of a patent to him without conveyance by him to the State of these reserved mineral rights. A demurrer of the defend-

ants to the bill was sustained, and in affirming this ruling the United States Circuit Court of Appeals, after referring to the Walpole case, supra, remarked:

"But we observe that the supreme court of the State in the later cases of Gunter v. Walpole, 65 Colo. 234, 176 P. 290, and Cronk v. Shoup, 70 Colo. 71, 197 P. 756, held that the whole contract, as evidenced by the certificate of purchase containing the reservation clause, was a void agreement, the board being without authority at the time the certificate was issued to make a contract with such a reservation. The purchaser was charged with knowledge that the board had no such authority. There is no allegation in the bill that the purchaser objected and protested the insertion of the reservation clause in his certificate of purchase, nor that he did not know that it had been inserted, nor is it alleged that the advertisement of sale exposed for sale the whole title. So far as appears from the bill, Driscoll bid for only the surface rights, he held the certificate with the reservation clause in it and continued to make payments on it over a period of thirteen years, and a court of equity will not decree that he is entitled to more than he purchased and more than he contracted for. Assuming we are in error on the subject of jurisdiction there is no merit in the suit on the facts disclosed by the bill."

The Supreme Court of the United States declined to review this decision on application being made there for a writ of certiorari, 277 U. S. 586, 48 Sup. Ct. 433. 72 L. Ed. 1000.

In the case at bar there is no averment that Kennedy objected to and protested the requirement of the clause inserted in his certificate of purchase for the lands here involved, requiring a reconveyance of the mineral and accompanying rights by him to the State. On the contrary, in his application to the Board, he expressly represented that he would reconvey them to the State. There was nothing invalid or illegal in such a promise on his part. The Board was not obliged to sell the land in question at all, as relator concedes. Its discretion-

ary power to put this land on open market was invoked by relator's express promise to reconvey to the State all mineral and mining rights. It is impossible, as we see it, to analyze the entire transaction from its inception to the making of the final payment, in the light of a careful study of the language used by both the parties to the contract, and not reach the conclusion that it was the clear intention of both the Board and Kennedy, as purchaser, that the title to mineral and mining rights in these lands should be retained by the State of Wyoming. Under such circumstances we cannot see that the principle of severability of legal and illegal provisions in a contract is at all applicable.

Kennedy always knew as he made his payments over the period of many years that the reconveyance clause had been inserted in the certificate of purchase he held and that the sale advertisement in its entirety and legal effect did not expose for sale the title to both the surface and the mineral and mining rights. Would it be equitable to adjudge that he is entitled to more than he himself applied for and purchased or the Board as the representative. of the State agreed he should receive? We think not. As we have seen, equitable principles control the issuance of the writ of mandamus and the inequitable consequences to the State of being compelled to carry out a contract it never made, a result which would inevitably ensue if the writ of mandamus were issued in this case, afford another compelling reason why it should not be granted.

It is argued that the use of the word "land" in the statutes of this State, providing for the sale by the Board of Land Commissioners of state owned property of that character, refers only to land in the sense of its having an indefinite extent upward and downward from the surface, and therefore it always includes whatever may be erected upon it and whatever may be directly under it. The word may have that meaning,

of course, under some circumstances, but it does not always have it. Reason and context play an important part in determining its true significance.

Thus in Stern v. Great Southern Land Co., 148 Miss. 649, 114 So. 739, the Court says:

"The deposits of clay, oil, and minerals under the surface of land, of themselves, constitute land, and are susceptible of separate ownership from the ownership of the surface of the land. Moss v. Jourdan, 129 Miss. 598, 92 So. 689. And such interest may be separately conveyed from all other interests in the land, as can be done of standing timber on land. We are of opinion that, under our partition statutes, tenants in common of any estate in land, in possession, which is susceptible of separate ownership and conveyance from the balance of the estate in the land, may have such interest partitioned."

In Selvey v. Grafton Coal & Coke Co., 72 W. Va. 680, 79 S. E. 656, it is said:

"The court properly overruled defendant's objection to the introduction of the deed from Thomas Selvey to John W. Selvey, dated 14th May, 1890. There is no material variance between that deed and the averment in the declaration that plaintiffs are the owners of the land. That averment is substantially proven by the deed, notwithstanding it purports to convey only coal and mining rights. Coal in place is land."

So in Young v. Young, 307 Mo. 218, 270 S. W. 653, 39 A. L. R. 734, the opinion states:

"That coal and other minerals in place are land and may be conveyed as such, and, when thus conveyed, constitute a separate and distinct estate and inheritance was decided by this court in Wardell v. Watson, 93 Mo. 107, 5 S. W. 605, and it is immaterial whether the mineral estate is created by express grant or by reservation."

Similarly the Supreme Court of Illinois in Kinder v. LaSalle County Carbon Coal Co., 301 Ill. 362, 133 N. E. 772, has indicated that:

"Coal, limestone, and other minerals in place are land and are attended with all the attributes and incidents peculiar to the ownership of land. Title to minerals, distinct from title to surface of land, may be proven in exactly the same way as title to the surface. Catlin Coal Co. v. Lloyd, 176 Ill. 275, 52 N. E. 144. Title to the mineral stratum may therefore be shown by proof of adverse possession, but the difficulty with respect to getting title of such an estate by adverse possession is found in the difficulty of getting and proving actual possession. By a severance separate estates are created which are held by separate and distinct titles, and each estate is incapable of possession by the mere occupancy of the other. Renfro v. Hanon, 297 Ill. 353, 130 N. E. 740; 2 Corpus Juris, 71; 1 R. C. L. 738."

Many additional authorities to the same effect as those above given could be supplied.

Stress is laid by relator upon the language of Section 91-513, quoted above, that when a patent for state lands is issued it shall "convey a good and sufficient title to the patentee therein named in fee simple," and it is said that the use of the words "in fee simple" establishes that the title to said land when sold must necessarily include all the minerals below the surface thereof.

However, in Barlow v. Security Trust & Savings Bank, 197 Calif. 263, 240 Pac. 19, it appeared that certain lands were granted to Barlow from which were reserved to the grantor and excepted from the grant all minerals and related rights, including all oil and like substances and the right to mine them, as well as rights of way and of storage over and within their surface. These mineral rights were subsequently conveyed to the Security Trust & Savings Bank. Barlow sought to have the Superior Court of Los Angeles County make an order under the Land Registration Act of the State requiring the registration of his title to said land. That law declared that: "No mortgage,

lien, charge, or lesser estate than a fee simple shall be registered unless the fee simple to the same land is first registered." The Bank opposed such registration on the ground that his title being subject to the mineral rights it held, and hence a "lesser estate than a fee simple," could not invoke the law. Holding that the title should be registered the court said:

"In Bouv. Law Dict. 'fee simple' is defined as—'An estate of inheritance. Co. Litt. 1 b; 2 Bla. Com. 106. The word simple adds no meaning to the word fee standing by itself. But it excludes all qualification or restriction as to the persons who may inherit it as heirs, thus distinguishing it from a fee tail, as well as from an estate which, though inheritable, is subject to conditions or collateral determination. I Washb. R. P. 51; Wright, Ten. 146; 1 Prest. Est. 420; Littleton, § 1.'

" 'Fee simple' therefore merely means that the interest of a given estate is inheritable and not subject to 'conditions or collateral determination.' Nor is the inheritable quality of the estate at all affected by the nature thereof."

After quoting from 1 Cooley's Blackstone (4th Ed.), Page 514, the court remarks:

"It thus appears that by the common law of England, as applied to the land here in question, the estate held by Barlow being unquestionably inheritable and not subject to any restriction as to heirs, etc. (as in fee tail), was fee simple in its nature, and the fact that some rights of entry thereon for the purpose of mining in presumably all of its varied branches were possessed by another, to wit, the Security Trust & Savings Bank, had no effect upon the inheritable quality of the estate remaining in Barlow."

The court calls attention to 1 Thompson on Real Property, § 87, as stating:

" 'Since minerals in place are part of the land, the owner of the fee in the land has the absolute right of property in the mines and quarries beneath the surface (citing cases), and all the mineral substances, while thus in place, are things of a real, and not a

personal character (citing cases). As we have seen, that part of the land consisting of minerals, or specified minerals, may become the subject of separate ownership by grant of the minerals by the owner of the land, or by a grant of the land with an exception of the minerals, and in either case an estate in fee simple is created in the minerals, as corporeal hereditaments. (Citing cases).' "

The opinion then proceeds to discuss the point involved thus:

"It follows that, with reference to the respective rights of the parties litigant to the lands in question, each was the owner of a fee-simple estate.

"So far as the term 'fee simple' may be considered, as connected with the tenure of the lands in question, the conclusion here intended to be reached is that lands originally held in fee simple, according to the common law of England, and consequently inheritable, were nevertheless subject to an independent and wholly detached right existing in another person, to-wit, the sovereign, to mine such lands, at least for gold and silver, and that the exercise of such right by the sovereign in no way affected the fee-simple title of the owner of the surface of the land. And so in the instant case, a 'fee-simple' title may exist in Barlow as to the surface of the lands in question, without in any manner being affected by the right of the Security Trust & Savings Bank (analogous to that of the early English sovereign with respect to English lands) to 'mine, dig or bore' for mineral substances thereon and therein."

It is evident that under these authorities, whose views would seem to be sound, when the Board of Land Commissioners authorized the issuance of a patent to the land, excepting, however, minerals and mining rights, a fee simple estate therein was thereby transferred to the purchaser, and the same would be true of a sale of the mineral rights only, with a reservation of the surface.

At the time the sale of the lands in question was

ordered by the Board of Commissioners, the Board was authorized to lease "any state or school lands supposed to contain coal, oil or minerals." Wyoming Compiled Statutes, 1910, § 619. The law also directed that all coal or mineral leases granted by the Board "shall be separate and distinct from any lease of the grazing privileges thereon and may be made by said board, and the regulations so made by said board in connection therewith shall provide for the use of said lands for grazing purposes without interference by the lessee of coal or mineral privileges." Wyoming Compiled Statutes, 1910, § 624. The Board also possessed power to "at any time direct the sale of state lands." Wyoming Compiled Statutes, 1910, § 627.

From the foregoing it is seen that there was authority granted by statute for the Board to issue a mineral lease of state lands, vesting the holder thereof with the right to extract all the minerals from such lands, and also at the same time to either lease or sell the surface of the land. This procedure thus sanctioned by the Legislature obviously operated practically to allow the Board to separate the surface rights in the land from those relating to mineral rights and to dispose of them separately. Undoubtedly, if it saw fit, the Board could lease the minerals to be found in the lands, and when all such had been extracted, it could order that a sale be made of that portion of the land remaining. It is difficult to perceive why under statutory authority of this character, the Board should not be permitted to reverse the procedure and sell the surface rights first and then by reserving the minerals to the state, subsequently lease them. The order in which the transactions were consummated should make no difference. We think, therefore, that the Board had lawfully the power to reserve the minerals to the State, as was done in this case.

It may further be observed in support of this con-

clusion that this construction of the law governing the matter of sale of public lands and the practice of the Board in thus making reservations of minerals and mining rights, has been one consistently followed for nearly twenty years last past and is well known throughout this State. Successive legislatures have not interfered to prevent it, although they undoubtedly were cognizant as to what was being done. The construction placed by the Board upon the law it is legally charged to administer should not be disregarded unless clearly wrong. 25 R. C. L. 1043, § 274. As already intimated, we do not think that construction erroneous. We are convinced, also, under the Wyoming statutory provisions reviewed above, that the case at bar is clearly differentiated from the statutory basis upon which the Walpole case, supra, held the Board without power to make mineral reservations in a conveyance of state land. We are cited to no Colorado statutes of similar character and the opinion in that case discloses none.

The demurrer to the petition of relator will accordingly be sustained and the issuance of a peremptory writ of mandamus denied.

KIMBALL, Ch. J., and BLUME, J., concur.

### On Petition for Rehearing

RINER, Justice.

A petition that a rehearing be granted in this case has been filed by the relator. It consists largely of a reargument of the points urged in his brief and at the hearing. All these were given careful review before the opinion in the cause was filed. Relator has also included in his argument aforesaid a statement of alleged errors committed by the court in announcing its views on the legal points presented. We are obliged to

say that he has failed to convince us that we were mistaken.

No amount of argument can cloak the outstanding and clearly established facts in this litigation that the State Board of Land Commissioners did not intend to sell the mineral rights in the land here involved to Kennedy, the original purchaser; that Kennedy himself never intended to buy them and voluntarily stated so repeatedly over his signature; and consequently that to order a delivery of the patent as sought by relator would be to make and enforce a contract to which the parties making it themselves never gave their assent.

Reliance is especially placed by relator upon certain federal decisions, particularly Burke v. Southern Pacific Railway Co., 234 U. S. 669, 34 Sup. Ct. 907, 58 L. Ed. 1527, dealing with the power of the United States Land Department officials to insert reservations in patents issued under the national land laws. We do not consider them in point. Relative to the federal public lands, the land officers of the United States do not, like the State Board of Land Commissioners concerning state school lands, have the direction, control, lease and disposal of such lands. That authority reposes in Congress. The federal land officials have no discretion allowed them as to the transfer of such lands. In issuing a patent they function in a ministerial capacity solely and are powerless to change the legal rights of the parties. When an applicant has complied with the law governing the particular entry he makes, they must pass title to him. They cannot refuse to sell the land. Relator has at all times conceded, and correctly, we think, that the Board aforesaid may sell or decline to sell the lands in its care, as it deems to the best advantage for the State. It initiates the sale proceedings, not the applicant, as under the federal system.

In this connection, too, it may be noted as extremely significant that under the provisions of the law in force at the time this contract was made (Wyoming Compiled Statutes, 1910, Sections 602, 627), the Board was given legislative authority not only to lease or sell, but also to "dispose of" the lands under its control. As said by the Supreme Court of the United States in Phelps v. Harris, 101 U. S. 370, 25 L. Ed. 855: "The expression 'to dispose of' is very broad, and signifies more than 'to sell.'" In American Home Missionary Society v. Wadhams, 10 Barb. 597, the word "dispose" was declared to be "sufficiently comprehensive in its meaning to include every possible mode of alienation or disposition of property." The broad authority thus vested in the State Board of Land Commissioners with reference to these lands thus becomes perfectly apparent.

In State ex rel. Otto v. Field, 31 N. M. 120, 241 Pac. 1027, a case which relator apparently considers as one supporting his views in the matter before us, but which we think is an authority emphatically against him, the appellee, Otto, presented contentions much like those urged here. He sought by mandamus to compel Field as Commissioner of Public Lands of New Mexico to issue to him a deed to certain state lands without the insertion of a reservation of the minerals contained therein. The authority given the Commissioner by law provided that he, like our State Board of Land Commissioners, should "have the direction, control, care and disposition of all public lands under the provisions of the Act of Congress relating thereto and such regulations as might be provided by law." He, like our State Board aforesaid, was also authorized by law to grant rights of way and easements of various kinds across or upon the state lands.

Disapproving a contention made by the appellee similar to that urged by relator, as to the meaning of

the word "land" in the applicable statutory law, the court said:

"If appellee's contention is correct that, upon the acceptance of his bid and the payment of the first installment under his contract and the receipt therefor, he is not only the equitable owner of the lands from the center of the earth to the topmost heavens, but also has complete dominion thereover, subject only to defeasance by failure to liquidate the other installment payments upon his contract, and that the commissioner had no authority to reserve the minerals, oil and gas to the state, such minerals, oil and gas belonging to purchaser, subject only to forfeiture for fraud or for the failure to make installment payments on his 30-year contract, we would face the conclusion that he could, in such enjoyment of the lands, explore for oil and gas immediately after the acceptance of his bid and issuance to him of a receipt for his first installment payment under the contract, and if he were fortunate in making a discovery of oil, might drain the lands thereof and then abandon his contract. This would accomplish a result which we do not believe was intended by the Legislature and which, if necessary, the rules of statutory construction authorize us to avoid."

Disposing of another point akin to that presented at bar, this language was used:

"Appellee also contends that, where the Constitution and statute conveying powers on the commissioner fail to specifically authorize him to reserve the minerals, he has no such power. We do not agree to that narrow construction of the powers of the commissioner. If it was intended by the Constitution makers and the Legislature to cover every contingency, they would not, at the time of giving specific directions, also repose general jurisdiction or power of control and disposition over the state lands."

The court further said:

"The commissioner has been specifically directed by the Legislature to lease the known minerals, to make leases and contracts to explore for the unknown min-

erals, to grant rights of way and easements over and across and upon state lands for eight specific purposes, and for other purposes which are left to the discretion of the commissioner. If, in the exercise of this discretion, the commissioner has made leases, contracts, and made grants of rights of way and easements, he would be powerless to sell the land, if he must sell it in its entirety or not at all. If the commissioner might incumber the lands with leases, contracts, grants of rights of way, and easements before the land is sold, and then afterwards sell the land subject to these incumbrances, we are unable to see why he may not, in case of sale of land, reserve the right to later incumber it, if the purchaser is willing to buy with such a reservation. The commissioner is specifically, by section 5233 of the Code, directed to insert in leases of state lands for grazing or agricultural purposes a clause reserving the right to execute leases for mining purposes thereon or for the extraction of petroleum, natural gas, salt, or other deposits therefrom, and the right to sell or dispose of any other surface products of such lands other than grazing, agricultural, or horticultural products; also a clause reserving the right to grant rights of way and easements for any of the purposes mentioned in section 5231. It being apparent that it was the policy of the Legislature to reserve to the state the right to execute leases for the extraction of petroleum, etc., it seems reasonable that the commissioner could also make the same reservation in a contract for the sale of agricultural or grazing lands sought to be purchased, and in which it was not then known that any mineral products existed."

The judgment of the lower court awarding the writ of mandamus was accordingly reversed, with instructions to discharge the writ.

We realize perfectly how strongly counsel feel that we are mistaken in our disposition of this case. Their zeal in supplying us with an elaborate brief in support of the petition for a rehearing establishes that. However, we are quite unable to agree with them, being of the opinion that the true purport of our law governing the matter in hand will be best maintained and the

rights of the parties involved more equitably preserved by an adherence to the result heretofore announced.

The petition for a rehearing will therefore be denied.

*Rehearing denied.*

KIMBALL, Ch. J., and BLUME, J., concur.